STATE OF NORTH CAROLINA v. TED ANTHONY PREVATTE

No. 492A99

(Filed 4 October 2002)

### 1. Venue— change—vicinage rights—no right to county of choice

The trial court did not violate defendant's vicinage rights in a first-degree murder and second-degree kidnapping case by changing venue from Anson County to Stanly County, because: (1) although defendant failed to present a sufficient showing of prejudice to change venue, the trial court had inherent authority in its discretion to change venue; (2) the trial court was making a decision at defendant's request to benefit defendant in his upcoming trial; (3) the trial court took into consideration whether there were adequate facilities and manageable dockets in the other counties; and (4) defendant does not have the right to change venue to the county of his choice, and a defendant may not condition a motion for a change of venue upon the trial court's agreeing to transfer the case to a particular county specified by defendant.

### 2. Criminal Law— request for ex parte hearing—pro se motion to dismiss attorneys

The trial court did not err in a first-degree murder and second-degree kidnapping case by failing to allow defendant's personal request to speak to the court outside the presence of the prosecution regarding his pro se motion to dismiss his attorneys, because: (1) the primary matter about which defendant desired to speak with the trial court in private was resolved; (2) the trial court properly granted defendant a hearing so defendant could explain his desire to change attorneys, but defendant failed to provide the trial court with sufficient information to support his motion for new counsel; (3) it does not appear that defendant and his attorneys ever reached an impasse such that the attorneys could not competently function when defendant's attorneys eventually agreed to obtain money for a private investigator as defendant requested, and it appears that defendant wished only that his attorneys would seek funds to obtain physical evidence; (4) it was within the attorneys' discretion to use their time and energy as they saw best to prepare for trial; and (5) defendant failed to present any evidence that an issue of a personal nature

was at stake, and defendant merely indicated that additional evidence might exist.

### 3. Constitutional Law— right to counsel—duty of loyalty—work product

A defendant in a first-degree murder and second-degree kidnapping case was not denied his Sixth Amendment right to counsel even though defendant alleges his attorneys violated their duty of loyalty and revealed their work product in front of the prosecution, because there is no evidence that defendant's attorneys revealed any information that constituted work product when the attorneys simply responded to the trial court's questions concerning what they had done to investigate and prepare the case without disclosing any of their mental processes.

### 4. Criminal Law— motion to dismiss attorneys—State's participation

The trial court did not err in a first-degree murder and second-degree kidnapping case by allegedly allowing the State to participate in the decision on defendant's motion to dismiss his attorneys, because: (1) the State's comments merely reflect its interpretation of the law governing defendant's motion as well as its belief that defendant was attempting to stall his trial; and (2) it was proper to ascertain the State's stance on defendant's motion since the timing of the trial could have affected the State.

### 5. Discovery— medical and psychological records—failure to object

The trial court did not err in a first-degree murder and second-degree kidnapping case by granting the State's request for discovery of defendant's medical and psychological records and by requiring the defense's psychology experts to issue written reports allegedly in violation of N.C.G.S. § 15A-905, because: (1) defendant never objected to the trial court's grant of the relevant discovery to the State; and (2) defendant agreed that the law gave the State the right to obtain the materials requested.

### 6. Jury— capital selection—motion to strike panel—juror recognized mug shot of defendant in newspaper

The trial court did not err in a first-degree murder and second-degree kidnapping case by denying defendant's motion to strike the panel of jurors that heard a prospective juror's com-

ment that she recognized a mug shot of defendant in the newspaper even though defendant contends the information allowed the other jurors to speculate about prior crimes defendant may have committed, because: (1) defendant provides no evidence that the mug shot the prospective juror saw was connected to another crime; and (2) there is no reason to believe the other jurors formed any improper opinions based on the prospective juror's comment about the mug shot.

**7. Criminal Law— prosecutor's argument—jury voir dire— jurors did not have to believe expert**

The trial court did not err in a first-degree murder and second-degree kidnapping case by permitting the State's comments during jury voir dire that the jurors did not have to believe any part of what an expert said simply based on the fact that the person is an expert witness, because: (1) the prosecutor did not express an opinion as to the credibility of specific witnesses; (2) the State's questions were simply intended to determine if jurors would equally consider testimony of lay witnesses concerning defendant's mental capacity; and (3) the State's questions regarding expert witnesses were in concert with the trial court's jury instruction regarding expert witnesses.

**8. Criminal Law— prosecutor's argument—vouching—arguing just and true case**

The State did not improperly vouch to the jury in a capital trial that it was arguing the just and true case by comments to prospective jurors about reaching the sentencing phase because: (1) the State never said the sentencing phase definitely would be reached, but only insinuated such a possibility; and (2) the trial court's clarifications and the prospective jurors' responses to the trial court and the State made it clear that the prospective jurors were not under the impression the sentencing phase was a certainty.

**9. Jury— capital—duty to stand up alone and announce death verdict—excusal for cause**

The trial court did not err in a first-degree murder and second-degree kidnapping case by allowing the State to inform prospective jurors that as a part of their duty they might have to stand up alone and announce a death verdict and by excusing for cause a prospective juror based on the fact that she could not fulfill this duty, because: (1) the State and the trial

court were merely describing the polling process to the jurors; and (2) the trial court perceived an inability on the prospective juror's part to follow the law with regard to imposition of capital punishment.

**10. Evidence— testimony—bases of opinions—state of mind—failure to make offer of proof**

The trial court did not err in a first-degree murder and second-degree kidnapping case by allegedly violating defendant's right to present evidence in his defense by failing to allow two expert witnesses to state the bases of their opinions and by limiting the testimony of some lay witnesses about defendant's state of mind, because: (1) one of the witnesses was allowed to testify about the general basis of her opinion; (2) defendant failed to make an offer of proof regarding the expert witnesses' testimony; and (3) defendant failed to make an offer of proof regarding the testimony of the lay witnesses and it appears unlikely the observations of these lay witnesses would have substantially impacted the jury's consideration of defendant's sanity.

**11. Constitutional Law— effective assistance of counsel—psychological defenses—diminished capacity**

A defendant in a first-degree murder and second-degree kidnapping case did not receive ineffective assistance of counsel even though defendant contends his attorneys' failed to adequately present psychological defenses including diminished capacity, because: (1) it can only be speculated whether the questions defendant contends should have been asked to support a diminished capacity defense would have been answered favorably to defendant; and (2) it was a matter of trial strategy to determine whether to offer evidence of both diminished capacity and insanity or to focus all efforts on insanity.

**12. Criminal Law— prosecutor's argument—validity of expert testimony**

The trial court did not err in a first-degree murder and second-degree kidnapping case by allowing the State's closing arguments regarding the validity of defendant's expert testimony and alleged attacks on the expert, because defendant failed to show the trial court abused its discretion in handling the State's actions at trial.

**13. Evidence— hearsay—purpose other than truth of matter asserted**

The trial court did not allow impermissible hearsay evidence in a first-degree murder and second-degree kidnapping case by allowing evidence from a witness stating that the victim's husband visited the victim on the day of the murder and told her he loved her because: (1) the statement was admitted for a purpose other than to prove its truth; (2) the statement is evidence that the victim believed a reconciliation was forthcoming and supported the victim's fear that defendant boyfriend might try to harm her or her family; and (3) the statement supports a conclusion that defendant was motivated to kill by the victim's desire to end her relationship with defendant and reconcile with her husband.

**14. Evidence— rocky relationship—personal knowledge**

The trial court did not commit prejudicial error in a first-degree murder and second-degree kidnapping case by allowing testimony from a witness stating that the relationship between the victim and her husband was rocky but that they always seemed to get back together even though defendant contends the testimony was given without personal knowledge, because as defendant concedes, this testimony was tested on cross-examination when the witness admitted that she did not live with the victim and her husband and thus did not know what she meant by "rocky."

**15. Evidence— hearsay—state of mind exception**

The trial court did not allow imperissible hearsay evidence in a first-degree murder and second-degree kidnapping case by allowing a witness to testify that the victim told her that the victim was attempting to reconcile with her husband, because: (1) the testimony was admissible under the N.C.G.S. § 8C-1, Rule 803(3) state of mind exception to show the victim's mental state and provided insight into her confrontation with defendant; and (2) the statement was an expansion on the origin of the victim's fear of defendant boyfriend.

**16. Evidence— hearsay—objection sustained**

The trial court did not err in a first-degree murder and second-degree kidnapping case by sustaining an objection when defendant asked a witness whether the victim's husband asked the witness to keep an eye on his wife and defendant boyfriend

so that the husband could use the information in court over custody of the kids, because the question solicited hearsay and was improper.

### 17. Jury— capital selection—voir dire—insanity defense

The trial court did not err in a first-degree murder and second-degree kidnapping case by overruling objections to the State's argument that allegedly distorted the legal standard applicable to the insanity defense during jury voir dire, because: (1) defendant waived this issue by failing to provide a transcript reference in his brief to the alleged statement and by failing to make an assignment of error on this issue as required by N.C. R. App. P. 10(a); and (2) even if defendant did not waive this issue, the statement was a proper attempt by the State to ascertain if jurors could follow the law concerning defendant's guilt as well as whether defendant was not guilty by reason of insanity.

### 18. Criminal Law— prosecutor's argument—insanity defense

The trial court did not err in a first-degree murder and second-degree kidnapping case by overruling objections to the State's argument that allegedly distorted the legal standard applicable to the insanity defense during closing arguments, because: (1) the State properly argued that defendant's mental illness did not alone meet the requirements for legal insanity; and (2) any alleged error by the State, stating that if the jurors found defendant insane that they should let him go, was properly handled by the trial court's instruction.

### 19. Criminal Law— prosecutor's argument—jury's duty to enforce law

The trial court did not err in a first-degree murder and second-degree kidnapping case by allowing the State to argue during closing arguments that the jury's duty is to enforce the law, because: (1) the State used its argument to clear up any jury confusion about the responsibilities of the police, the prosecutors, the judge, and the jury; and (2) the State sought to ensure the jury understood that its proper role included holding defendant accountable.

### 20. Criminal Law— prosecutor's argument—additional evidence during sentencing

The trial court did not err in a first-degree murder and second-degree kidnapping case by allowing the State to argue

STATE v. PREVATTE

[356 N.C. 178 (2002)]

during opening and closing arguments that if the jury found defendant guilty it would learn more during sentencing, because: (1) the State's argument merely reemphasized what the jury already knew, including that additional evidence would be submitted on the question of defendant's sentence if defendant was found guilty; and (2) this procedural issue was fully explained to the jury during jury selection.

**21. Criminal Law— prosecutor's argument—consider in victim's shoes**

The trial court did not err in a first-degree murder and second-degree kidnapping case by allegedly allowing the State to request during opening arguments that the jurors consider the victim as a relative and put themselves in the victim's shoes, because: (1) the State was simply providing some background on the victim; (2) the State's comment that the victim could be related to a member of the jury was an effort to show the victim was a typical community member; and (3) there is no indication the State was urging the jurors to put themselves in the victim's shoes.

**22. Criminal Law— prosecutor's argument—lack of consequences**

The prosecutor in a first-degree murder and second-degree kidnapping case did not improperly refer during opening and closing arguments to the lack of consequences defendant had suffered in the six years since the crimes were committed, because: (1) a reading of the arguments in their totality reveals that the prosecutor was suggesting defendant acted in a planned way and made numerous decisions in the process of the killing; (2) the trial court immediately admonished the prosecutor to stick to the evidence when he briefly remarked about the six-year time period; and (3) there was no instance where the prosecutor referred to the consequences to defendant as being relevant to the jury's determination of guilt.

**23. Criminal Law— prosecutor's argument—no witness of a psychotic episode**

The trial court did not err in a first-degree murder and second-degree kidnapping case by allowing the State to argue that there was not one witness for the defendant that could say the person committing the murder was having a psychotic episode or having some type of out-of-body experience because, despite the existence of conflicting expert opinion on the issue,

the State was properly pointing out that there was no definitive evidence to prove an episode took place.

**24. Criminal Law— prosecutor's argument—manipulation of mental tests**

The trial court did not err in a first-degree murder and second-degree kidnapping case by allowing the State to attempt to impeach the insanity defense with the idea that defendant had taken mental tests several times and knew how to manipulate them, because: (1) it was proper for the State to argue that defendant had some expertise portraying his psychological makeup in a favorable manner considering the broad evidence of defendant's mental problems and the evaluations and treatments he received for these problems; and (2) the trial court instructed the jurors that if their recollection of the evidence differed from that presented by the attorneys in argument, the jurors should disregard what the attorneys said and rely solely on their own independent recollection.

**25. Criminal Law— prosecutor's argument—expert gathered information from others**

The trial court did not err in a first-degree murder and second-degree kidnapping case by allowing the State to argue that its own expert had gathered information from other people in forming his opinion, because: (1) the State did not proceed with this line of argument after defendant's objection, and the State asked the jury to consider this issue based on its own recollection of testimony from the trial; and (2) the State's argument was in line with the trial court's instruction for the jurors to base their deliberations on their own memory of testimony.

**26. Criminal Law— prosecutor's argument—fairness defendant showed victim—putting words in mouth of witnesses**

The trial court did not err in a first-degree murder and second-degree kidnapping case by allowing the State to urge the jury to contrast the court's fair treatment of defendant to defendant's treatment of the victim and to state that defense counsel was putting words in the mouths of the witnesses, because: (1) the State's remarks concerning the fairness defendant showed the victim were well within the parameters created by our Supreme Court; and (2) the State's comment concerning defense counsel putting words in the mouths of witnesses was a response to defendant's attacking closing argument, was not abusive or

ongoing, and was isolated and did not deprive defendant of a fair trial.

### 27. Criminal Law— insanity—burden of proof—instructions

The trial court's instruction in a first-degree murder and kidnapping case that defendant had the burden to "prove insanity to your satisfaction" sufficiently charged the jury on the standard of proof needed by defendant to prove his insanity without an instruction that defendant had the burden of proving insanity by a preponderance of the evidence. Furthermore, the jury could not have been confused by the court's use of the terms "satisfied," "convinced," and "proof beyond a reasonable doubt" where the court fully instructed the jury on which standard to use and told the jury not to use the "beyond a reasonable doubt" standard in considering whether defendant was insane.

### 28. Constitutional Law— comment on right to remain silent— no direct reference—courtroom demeanor

The trial court did not commit plain error in a first-degree murder and second-degree kidnapping case by failing to intervene ex mero motu to prevent the State from allegedly commenting on defendant's exercise of his right to remain silent, because: (1) the State's argument that no witness could testify that defendant was having a psychotic episode at the time of the crimes was merely a comment on the witnesses who had testified and was not a direct reference to defendant's silence; and (2) the State's comment on defendant's failure to look into the jurors' eyes was merely a brief reference to defendant's courtroom demeanor.

### 29. Evidence— defendant would kill victim but mother paid too much to get him out of prison—motivation— deliberation

The trial court did not abuse its discretion in a first-degree murder and second-degree kidnapping case by overruling defendant's objections and denying defendant's motion to strike testimony by a State's witness informing the jurors about a statement defendant made that he would kill the victim but his mother paid too much money to get him out of prison, because: (1) the part of the statement in which defendant said he would kill the victim showed that defendant had the motivation to kill the victim and that defendant had thought about killing the victim for some time before the murder occurred; (2) the part of the statement where

defendant said his mother paid to get him out of prison allowed the jury valuable insight concerning defendant's thinking and evaluation prior to the murder; (3) hearing both parts of the statement gave the jury the opportunity to see how defendant was deliberating over whether to kill the victim since defendant's mental state was an issue at trial; (4) the testimony did not reveal why defendant had been in prison or why his mother paid for his release; and (5) any prejudice from the admission of the testimony was not significant since defendant, in questioning his own witnesses as well as in closing arguments, disclosed that he had spent time in prison.

**30. Kidnapping— instructions—purpose of confinement or restraint**

The trial court's instructions in a prosecution for two kidnappings did not unconstitutionally relieve the State of its burden of proving all elements of kidnapping because the court instructed the jury that it must find the confinement, restraint or removal was for the purpose of "murder" rather than "first degree murder," as specified in both indictments, or because the court failed to instruct the jury that it must also find defendant was "terrorizing" the second victim when the indictment in that case alleged terrorizing the victim as an additional purpose, where (1) both indictments alleged that the kidnapping was "for the purpose of facilitating the commission of a felony, First Degree Murder," and language in the indictments following "the commission of a felony" is mere surplusage and may properly be disregarded; and (2) although the indictment may allege more than one purpose, the State has to prove only one of the alleged purposes in order to sustain a conviction of kidnapping, and it was not necessary for the court to include terrorizing in its instructions.

**31. Kidnapping— second-degree—additional restraint—sufficiency of evidence**

The trial court did not err by upholding defendant's second-degree kidnapping convictions even though defendant contends they were an inherent and integral part of the female victim's murder, because the binding and the beating of the female victim and the restraint on the male victim were not essential actions necessary to restrain the female victim in order to murder her, but were additional actions that increased her helplessness and vulnerability.

**32. Criminal Law— motion for mistrial—previous escape from prison—prior murder**

The trial court did not abuse its discretion in a first-degree murder and second-degree kidnapping case by failing to declare a mistrial when the State introduced evidence that defendant escaped from prison while serving time for a prior murder in Georgia, because: (1) the trial court sustained defendant's objection and instructed the jury to disregard the reference to the escape; and (2) it is presumed that the jury followed the trial court's instructions.

**33. Criminal Law— legal insanity—consideration after defendant found not guilty**

The trial court did not err in a first-degree murder and second-degree kidnapping case by instructing the jury not to consider defendant's special issue of legal insanity unless the jury first found defendant was not guilty, because: (1) the trial court fully instructed the jury that it was to consider the insanity defense only if it found the State had proved its case beyond a reasonable doubt; and (2) taken in context with the trial court's instructions on the insanity defense consistent with the pattern jury instructions, there was no error.

**34. Sentencing— capital—aggravating circumstance—defendant previously convicted of another capital offense—failure to submit**

The trial court did not err in a capital sentencing proceeding by allowing the State to decline to present evidence of the aggravating circumstance under N.C.G.S. § 15A-2000(e)(2) that defendant had previously been convicted of another capital offense even though defendant had been found guilty of murder in 1974 in Georgia, because the State chose to proceed under the N.C.G.S. § 15A-2000(e)(3) aggravating circumstance that the offense was a prior violent felony, and the fact that defendant had been convicted previously of murder was thus submitted to the jury for its consideration.

**35. Sentencing— capital—jury instruction on life imprisonment—invited error**

The trial court did not err in a capital sentencing proceeding by instructing the jury that it would have to choose between life imprisonment without parole and the death penalty even though

the maximum sentence at the time defendant committed the murder was the death penalty or life imprisonment with the possibility for parole, because: (1) defendant did not object to and in fact invited the trial court's error by requesting the instruction on life imprisonment without parole; (2) defendant repeatedly urged the jury to recommend a sentence of life imprisonment without parole; (3) a defendant cannot complain about a jury instruction that he specifically requests; and (4) defendant has no ex post facto claim since he was sentenced to the maximum punishment of death.

**36. Sentencing— capital—aggravating circumstance—murder part of course of conduct—no plain error**

The trial court did not commit plain error in a capital sentencing proceeding by failing to specify and define the alleged crime of violence in the N.C.G.S. § 15A-2000(e)(11) aggravating circumstance that the murder was part of a course of conduct, because: (1) the trial court never promised to specify a crime to constitute the course of conduct, and there is no requirement that the trial court specify the crime or crimes to support this circumstance; and (2) there was no possibility of double-counting even though the N.C.G.S. § 15A-2000(e)(5) aggravating circumstance was submitted since the (e)(5) circumstance was limited to the kidnapping of the female victim while the (e)(11) circumstance was limited to the kidnapping and assault of the victim's son.

**37. Sentencing— capital—aggravating circumstance—murder part of course of conduct—single crime sufficient**

The trial court did not err in a capital sentencing proceeding by instructing the jury that a single crime of violence could support the N.C.G.S. § 15A-2000(e)(11) aggravating circumstance that the murder was part of a course of conduct, because: (1) the trial court instructed in a manner virtually identical to the pattern jury instructions; (2) a trial court may instruct the jury on (e)(11) by limiting the jury's consideration to the conduct involved in one other crime, and evidence of one other crime is sufficient to submit this circumstance; and (3) there was substantial evidence that defendant committed two violent crimes against the murder victim's son.

**38. Sentencing— capital—aggravating circumstance—murder especially heinous, atrocious, or cruel**

The trial court did not err in a capital sentencing proceeding by submitting the N.C.G.S. § 15A-2000(e)(9) aggravating circumstance that the murder was especially heinous, atrocious, or cruel, because evidence showed the murder was pitiless, unnecessarily tortuous, and that it dehumanized the victim when: (1) defendant attacked the victim in the presence of her ten-year-old son; (2) defendant psychologically tortured the victim by threatening her son and locking him in a bathroom; (3) the victim did not know if defendant would kill her son as well; and (4) defendant struck the victim multiple times and shot her as she was trying to run away.

**39. Sentencing— capital—motion to strike death penalty—discretion—constitutionality**

The trial court did not err in a capital sentencing proceeding by failing to grant defendant's motion to strike the death penalty based on the fact that North Carolina's capital punishment scheme does not allow for discretion to choose not to seek the death penalty, because: (1) the required discretion is satisfied by the guided discretion given to juries who sentence defendants in capital cases in North Carolina; and (2) our Supreme Court has repeatedly held that our capital punishment system is constitutional despite the prosecutor's possession of broad discretion.

**40. Sentencing— capital—prosecutor's arguments—defendant previously convicted of murder**

The trial court did not err in a capital sentencing proceeding by overruling defendant's objections to the State's sentencing argument emphasizing that defendant had been previously convicted for a Georgia murder and that the only way to ensure defendant would not murder again was to return a death verdict, because defendant was convicted of the Georgia murder and the State had every right to refer to it during closing argument.

**41. Criminal Law— prosecutor's argument—jury as law and justice—no impropriety**

The prosecutor's argument in a capital sentencing proceeding telling the jury that "Today, you are the law. You are justice" and that "you 13 people are the law of this county" was a proper argument that the jury was the conscience of the community for the

purposes of defendant's trial and was not an improper argument that the jurors are a prosecutorial arm of the government.

## 42. Sentencing— capital—prosecutor's arguments—defendant wrote his own judgment

The trial court did not err in a capital sentencing proceeding by overruling defendant's objections to the State's sentencing argument that defendant wrote his own judgment, because: (1) the State's argument simply emphasized that defendant chose to take another's life; and (2) nothing in the argument relieves the jury of its responsibility of fairness and impartiality.

## 43. Criminal Law— prosecutor's argument—find defendant guilty for justice of victims' families

The trial court did not err in a first-degree murder case by overruling defendant's objections to the State's argument during the guilt-innocence phase that the jury should find defendant guilty in order to do justice for the victim and her family, because: (1) a prosecutor may properly argue that the victim's death represents a unique loss to the victim's family; (2) a prosecutor may argue the jury should do justice for the victim and the victim's family if the argument does not specifically relate to the family's opinion about the defendant or the crime; and (3) the reference to the victim's spirit being at the trial was nothing more than a reference to remaining family members and their need for justice.

## 44. Sentencing— capital—prosecutor's argument—belittling defendant's mitigating circumstances

The trial court did not err in a capital sentencing proceeding by allowing the State to belittle the mitigating circumstances submitted by defendant, because: (1) prosecutors may legitimately attempt to belittle or deprecate the significance of a mitigating circumstance; and (2) the State properly argued that the circumstances should not be an excuse for defendant to avoid the consequences of his actions.

## 45. Sentencing— capital—reinstruction on mitigating circumstance

The trial court did not err in a capital sentencing proceeding by reinstructing the jury on the definition of mitigating circumstance, because: (1) the trial court followed the pattern jury instructions and instructed the jury about each statutory and

nonstatutory mitigating circumstance, making it clear that statutory and nonstatutory mitigating circumstances were different; (2) the punishment recommendation form differentiated between findings necessary for the jury to find statutory and nonstatutory mitigating circumstances; (3) the trial court never indicated to the jurors that they could give no weight to statutory mitigating circumstances they found to exist; and (4) defendant failed to object to the reinstruction after it was given, and the jury was able to reach a verdict without further inquiry.

**46. Sentencing— capital—peremptory instructions on mitigating circumstances—no factual inferences from trial court's rulings**

The trial court did not commit plain error in a capital sentencing proceeding by instructing the jury that it was not to make any factual inferences from his rulings after giving peremptory instructions on mitigating circumstances, because: (1) even when a peremptory instruction is given, jurors can reject the evidence if they lack faith in its credibility; and (2) the instruction permitted the jury to determine whether it believed the evidence presented even when contradictory evidence was presented, and the trial court's later instruction was consistent with the peremptory instructions.

**47. Sentencing— death penalty—proportionate**

A sentence of death imposed upon defendant for first-degree murder was not disproportionate because: (1) defendant was convicted on the basis of malice, premeditation, and deliberation, and under the felony murder rule; (2) defendant kidnapped the victim and her ten-year-old son at gunpoint in their own home, and defendant viciously killed the victim while she was running away; (3) and the jury found the prior violent felony, commission during kidnapping, heinous, atrocious and cruel, and course of conduct aggravating circumstances.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Helms, J., on 22 February 1999 in Superior Court, Stanly County, upon a jury verdict finding defendant guilty of first-degree murder. On 19 July 2001, the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of additional judgments. Heard in the Supreme Court 11 March 2002.

**STATE v. PREVATTE**

[356 N.C. 178 (2002)]

*Roy Cooper, Attorney General, by William B. Crumpler and Robert C. Montgomery, Assistant Attorneys General, for the State.*

*Center for Death Penalty Litigation, by Kenneth Rose, for defendant-appellant.*

WAINWRIGHT, Justice.

In 1995, Ted Anthony Prevatte (defendant) was sentenced to death after being found guilty of first-degree murder and two counts of second-degree kidnapping. *State v. Prevatte*, 346 N.C. 162, 484 S.E.2d 377 (1997). Following defendant's appeal from these convictions, this Court granted defendant a new trial. *Id.*

On 17 February 1999, at his second trial, the jury found defendant guilty of first-degree murder and two counts of kidnapping. The first-degree murder conviction was based on the theories of malice, premeditation and deliberation, and the felony murder rule. The jury recommended and the trial judge imposed a sentence of death for the murder conviction and consecutive terms of imprisonment of thirty years each for the kidnapping convictions.

The record reveals the following pertinent facts. The thirty-two-year-old victim (Cindy McIntyre) was married with two children (Michael and Matthew). She and her husband, Mike, were estranged but trying to reconcile. The victim and defendant attended the same church, sang together in the choir, and had been dating for about a year. Defendant lived with his mother across the street from the victim.

On 1 June 1993, when the victim and her husband saw each other, the victim's husband gave her a rose, kissed her, and told her he loved her. Later that same day, the victim and her son Matthew were at home when defendant came in with a present for Matthew. As Matthew was opening the present, his mother said, "Oh my God." Matthew turned around and saw defendant pointing a gun at his mother. Defendant had borrowed a gun from his cousin that afternoon.

When Matthew saw defendant with the gun, Matthew jumped up, and defendant pointed the gun at him. Defendant took the victim and Matthew to the bedroom and made them get down on their knees. Defendant then hit and kicked the victim. Defendant pointed the gun

at Matthew's head and said if the victim did not shut up, defendant would shoot Matthew.

Defendant grabbed Matthew and locked him in a bathroom down the hall from the bedroom. Defendant briefly left the house but shortly returned and brought the victim out of the house, with her hands bound behind her back. Defendant had his hands on the victim's neck and shoulder area. Defendant forced the victim into a car, pulled the victim back out of the car, and then struck the victim three to four times and slammed the victim's head into the car. The victim's hands remained bound behind her back. Defendant next reached into the car and pulled out a handgun. When the victim tried to run away, defendant held the gun with both hands, aimed, and fired more than once. Defendant left immediately after the last shot.

An autopsy of the victim's body revealed she suffered three gunshot wounds. Each bullet passed through the victim's body. One bullet went through the middle of the victim's back and completely destroyed her aorta and heart. Massive bleeding occurred in the chest cavity. These wounds caused the victim's death.

Inside the master bedroom of the victim's house, investigators found a nylon rope tied to a bed frame and a roll of duct tape on the floor. The roll of duct tape was consistent with the duct tape used to bind the victim's hands.

Prior to the murder, the victim told a witness she was afraid of defendant because he knew she was reuniting with her husband. The victim said she was afraid defendant would hurt her, her children, or her husband. Witnesses also heard defendant say he would kill the victim if he could get away with it and he "[felt] like killing her."

Before analyzing defendant's arguments, we first note that defendant's two trial attorneys in this case are the same attorneys who represented defendant in his 1995 capital trial for this murder.

We also note defendant presented an insanity defense at trial. Two defense experts expressed opinions that defendant had a paranoid personality disorder and was insane at the time of the shooting. The State offered rebuttal evidence that on the day of the murders, defendant was observed acting in a calm, friendly manner. The State's expert testified that on the day of the murders, defendant was able to understand the nature and quality of his actions as well as the difference between right and wrong.

## PRE-TRIAL ISSUES

[1] We first address defendant's assignment of error that his vicinage rights were violated in that venue should not have been changed from Anson County to Stanly County because the court lacked statutory authority to change venue, the court lacked inherent authority to change venue without giving an adequate reason, and defendant did not waive his right to venue. Defendant's argument is misplaced.

"The vicinage concept requires that the jurors be selected from a geographical district that includes the locality of the commission of the crime." 4 Wayne R. LaFave and Jerold H. Israel, *Criminal Procedure* § 16.1(b), at 462 (2d ed. 1999). "Technically, 'vicinage' means neighborhood, and 'vicinage of the jury' meant jury of the neighborhood or, in medieval England, jury of the county." *Williams v. Florida*, 399 U.S. 78, 93 n.35, 26 L. Ed. 2d 446, 456, n.35 (1970).

First, defendant contends he has a right to be tried in the county in which he was charged, namely, Anson County. The general rule in regard to venue is the prosecution must be in the county where the offense is committed. N.C.G.S. § 15A-131(c) (2001). However, defendant's contention ignores the facts of this case.

On 13 July 1998, defendant filed his motion for change of venue alleging that "there exists in the County of Anson . . . so great a prejudice against the defendant that he cannot obtain a fair and impartial trial." In support of his motion, defendant further alleged:

> 1. At the time of the incident alleged and continuing regularly thereafter, there was substantial pretrial publicity that created so great a prejudice against the defendant that he cannot obtain a fair and impartial trial in Anson County.
>
> 2. There is a reasonable likelihood that a fair re-trial will be prevented.
>
> 3. The transcript of the prior trial showing over 1800 pages of jury voir dire purports that the defendant cannot receive a fair and impartial re-trial in Anson County.

As a result of the foregoing, defendant "respectfully move[d] the Court to grant his motion for change of venue."

On that same date, the trial court was hearing other motions in this case while defendant and both of his attorneys were present in court. The trial court gave defendant the opportunity to hear his

motion for change of venue that day. Defendant was informed that his case was coming up for trial on 27 July 1998, which was two weeks away. Defendant, through his attorneys, asked that the motion for change of venue not be heard at that time.

On 25 July 1998, defendant filed a handwritten, notarized motion to dismiss counsel which provided:

> [O]n Monday, July 13, 1998 defendant was caused to appear in Superior Court in Anson County for pretrial motions on the part of the defense which defendant had not been given any prior knowledge of said pretrial motions hearing, of which one motion—motion for change of venue—was favored by the prosecution in regard to the change of location—Standly [sic] County—which defense counsel told defendant was in his favor (in 1994 before defendant's first trial at a special session of Superior Court, defense counsel, McSheehan and Painter disagreed with defendant on a change of venue saying that if a change of venue was granted by the court, that the D.A. would get to pick the county for the trial to be held in and that the D.A. Honeycutt would pick [Stanly County] and Stanly County was "more bloodthirsty than Anson County." And also at the July 13, 1998, pretrial hearing defense counsel Mr. McSheehan and Mr. Painter both lied to defendant in trying to have defendant believe that he was going to trial in two weeks on July 27, 1998, to try and trick defendant into agreeing to their pretrial motion for a change of venue while well knowing, from having talk[ed] to the D.A., that the July 27, 1998, trial date had already been scheduled for another murder case of State of North Carolina v. Chris Holden.

It should be noted that defendant had a history of writing letters to dismiss his counsel. On 13 October 1997, the trial court had held a hearing on defendant's motion to reconsider appointment of one of his attorneys. At that hearing, defendant asked the court to allow him to withdraw his motion requesting that Mr. Painter be removed as one of his appointed attorneys. The trial court allowed defendant's motion to withdraw.

On 24 August 1998, the trial court held a hearing on defendant's motion to dismiss counsel. The following lengthy colloquy took place:

THE COURT: This is your motion, Mr. Prevatte; is that correct?

MR. PREVATTE: Yes, sir.

THE COURT: All right. Do you want to offer any evidence, Mr. Prevatte?

. . . .

MR. PREVATTE: . . . I just don't feel comfortable with these two gentlemen anymore. They tell me one thing, and then on down the road, they tell me something totally contradicts what they told me the first time. There's evidence out there to prove that State's main witness Jeffrey Burr lied. And they won't get it.

They won't petition the court for the things I need, like a private investigator to check it out, and go get it. And they just keep me confused. They—they—they said they were ready to go to court in July when I went down to Anson County. And they tried to trick me into taking a change of venue in Stanly County, which is even bad or even worse than having it tried in Union County.

. . . .

MR. PREVATTE: . . . And then the prosecution was in agreement with it. Anything the prosecution is in agreement with in my case, isn't in my best interest. They just don't do what I tell them. I needed court—to petition the court to get a private investigator to check out the evidence that's out there.

THE COURT: They don't do what you tell them to do?

MR. PREVATTE: Sir?

THE COURT: They don't do what you tell them to do?

MR. PREVATTE: No, sir. That's not it.

THE COURT: What is it?

MR. PREVATTE: They are my attorneys. But it's also my case.

THE COURT: I understand that.

MR. PREVATTE: And I know what's—some of the things that need to be done. I've told them, and they won't do it. And it all— the law—the law states that when a defendant and his counsel come[] to an impasse, that the defendant's desires override those of his counsel. I've read that in the North Carolina laws and procedures.

THE COURT: Anything you want to tell me about it?

MR. PAINTER [defense counsel]: Not unless he waives attorney/client privilege.

MR. McSHEEHAN [defense counsel]: Not unless he waives attorney/client privilege, Judge. I'm not allowed to say anything.

. . . .

THE COURT: Well, what's your position as to whether or not these attorneys ought to remain in the case, whether or not some other attorney ought to be in it?

MR. GWYN [prosecutor]: Well, Your Honor, the defendant doesn't have the right to pick and choose whatever counsel he prefers to have or is more comfortable to have. We really feel, quite frankly, Your Honor, that the purpose of him filing this motion is simply for the purpose of delay. One alternative that occurs to the State is for the appointment of standby counsel in the form of Mr. Painter and Mr. McSheehan. Other than that, we take no position. We just want the court to be aware of our belief that Mr. Prevatte's motion in front of you is simply for the purpose of delaying and putting off the inevitable trial.

MR. PREVATTE: That's not so, Your Honor, with all due respect to the court. My attorneys, they—like I said, I just can't trust them no more. I know what's good for me and what's not good for me. And they—they half listen to me. They half—it's not to put it off. But how can you be ready to go to trial, when you haven't done some of the things that I specifically asked them to do? And then they try to trick me into agreeing to motions in Stanly County saying I was going to go to court in July, knowing full well that another inmate had been scheduled to go to court in July ahead of me.

When I first—first time we tried to get a change of venue out of Anson County, they said it will most likely be in Stanly County. And you don't want it there because the people in Stanly County is more blood thirsty than the people in Anson County. And now this time, they come back and say great, we got a change of venue, we're going to Stanly County. And the D.A. has agreed to it. I said, hold it.

THE COURT: Have you agreed to that?

MR. HONEYCUTT [prosecutor]: No, sir. The only thing—discussion that I've had about the change of venue, is I asked if they

were seriously going to contest it, that our position was going to be that the only court facility with a docket light enough to move the case was Stanly County. I also pointed out that the—that the defendant can get a quicker trial in Anson County. But I told them I didn't object on the State, they can be tried in any county they wanted to.

MR. PREVATTE: Your Honor, I asked my counsel to do things for back-up the change of venue outside the twentieth jurisdiction. Because I can't get a fair trial in Anson County, Richmond County, Stanly County or Monroe, due to the publicity. Not only in those counties, but out of Charlotte and the television news. And they won't do it. Then they come to me and say, we got you a change to Stanly County. There's going to be a good Judge there.

I told them, you said it was more thirsty—more blood thirsty in Stanly County than Anson County. Yeah, but they got a good Judge there. Like I told them, they could have the best Judge in the world. If that county had been prejudiced against me through news and other things, word of mouth and all, it would be just like Wadesboro, Anson County.

They—I've tried about getting witnesses to testify for me, expert witnesses. They keep telling me that the one said he don't remember me, and he don't want to come up here. I don't believe that. He—he's a psychiatrist. And he treated me for eleven months in Central State Hospital in Milledgeville, Georgia on a 24-hour basis. He, more than anybody, knows my mind.

And it's—you know, they—they try to say we was going to court in July. And they hadn't done all these things. And then I found out that the other guy had already been scheduled. As soon as the hearing was over, and I didn't want to go over these motions, Mr. Painter comes out and said, they're going to try so-and-so on the 27th. They knew that all along. They're playing mind games with me, Your Honor. And this is my life. I'm in a capital murder case.

THE COURT: What's your—what are you requesting in the case?

MR. PREVATTE: As what?

THE COURT: What are you asking me to do?

MR. PREVATTE:  I want new counsel. I would appreciate that.

THE COURT:  State care to be heard on that?

MR. GWYN:  No, sir.

THE COURT:  Have no opinion one way or the other?

MR. HONEYCUTT:  Yes, sir. We say that it's unfair to the State to drag us out now. And as to whether or not this case was to be tried in July, Mr. Painter and Mr. McSheehan were informed by my office that this case was on the calendar in July as the back-up case in the event the first murder case that was tried down there—and I believe it was before Your Honor—broke down. So this—we were targeting this case for trial in July. Mr. Painter and Mr. McSheehan were made aware of that and kept informed of that.

MR. PREVATTE:  Your Honor, all due respect to the court again. If they—if I was scheduled to be tried in July, if the other person wasn't, then my attorneys were totally unprepared. Because they hadn't done the things they needed to do.

THE COURT:  Well, hadn't they already prepared your case one time before?

MR. PREVATTE:  Yeah.

THE COURT:  What else did they need to do then?

MR. PREVATTE:  There's new evidence. There's not new evidence, but evidence that's been out there to prove that the State's main witness lied and made a deal with the D.A. to get 18 felonies dropped a month right after I was convicted. Not only did Mr. Honeycutt lie to the defense, he lied to the court and said he hadn't made a deal with the State witness.

THE COURT:  Well, what effort could they have made to show this? What are you saying your lawyers could have done that you don't already have?

MR. PREVATTE:  Well, I think, Your Honor—

THE COURT:  Didn't they attempt to ask the witness about that during the first trial? And the Judge didn't let them; is that right?

MR. PREVATTE:  That—that—that's right. But I thought—

THE COURT:  And isn't that why your case got reversed?

**STATE v. PREVATTE**

[356 N.C. 178 (2002)]

MR. PREVATTE: Yes, sir. But I'm also saying there's other evidence there to show that he lied. And that would change the whole, all the way around, in my opinion. But all they want, they say, well, what if they find DNA.

THE COURT: What do you say is out there?

MR. PREVATTE: For that incident, Your Honor, I'd like to ask a full hearing in your chambers outside the hearing of the prosecution.

THE COURT: Well, do you all agree what he says cannot be used against him?

MR. HONEYCUTT: No, sir. We will not agree to that.

THE COURT: You won't agree to that?

MR. HONEYCUTT: At this point, he still has two lawyers representing him.

THE COURT: Well, that's the reason your case got reversed; is that right?

MR. PREVATTE: No, sir. The case got reversed for lack of due process, which—

THE COURT: My understanding is the case got reversed because the court did not allow cross examination of whether or not some—

MR. McSHEEHAN: Davis. Judge, we were not allowed to cross examine the witness in front of the jury to probe him about any deal he may have or may not have had on the State, and let the jury pass on his credibility, and credibility questions asked and his responses thereto. And that's the Lass V Davis. And that's why it got reversed. The other 157 errors cited and passed on them, and they said they would not occur in the new trial.

THE COURT: All right. Mr. Painter, do you feel like you can continue to represent him in light of what's transpired?

MR. PAINTER: Your Honor, I have no animosity or no bad feelings toward Mr. Prevatte. I'm here at the court's direction to represent him as fully as my ability allows me to do so. And I would continue to represent him in the manner which I think under the law I am—I should be representing him. I will explain to him and talk to him any concerns he has. If he wants us to do something

that I feel is not in his best interest, I think I, as a lawyer, have a duty to make sure that I don't let him dictate something that is going to put him in harm's way.

And I think there's in fact a recent North Carolina Supreme Court case that basically says they're not to second-guess lawyers on post conviction relief where the defendant says, my lawyer didn't do so and so, because the defendant, first of all, didn't go to law school. Second of all, the lawyer in his expertise in being in the courtroom under fire, 12 people sitting in the box in a capital case is in a better position to judge what tactics to take than the Supreme Court sitting in Raleigh 18 months later.

THE COURT: Mr. McSheehan.

MR. McSHEEHAN: Judge, I have no problem continuing representing Mr. Prevatte or continuing to represent Mr. Prevatte if the court so desires. We've got a lot of hours invested in this case. New counsel would take a long time for them to catch up, I'm sure. I've told him regardless of how the court rules, we are here if he needs us. And we were there for eight weeks the last time. We made trips to Arkansas, Tennessee. We made trips to Florida—I mean to Georgia on his behalf. And—

THE COURT: Have you considered this psychiatrist or whomever he's talking about from some other state?

MR. PAINTER: We went down there and talked with him, took a 24-hour trip back on April the 12th with—where we sat on the tarmac, got the plane cancelled, and drove back from Atlanta. It was a 24-hour trip from start to finish. And went down there and spent about an hour with the psychiatrist.

THE COURT: Was he called at trial?

MR. PAINTER: I'm sorry?

THE COURT: Was he called at trial?

MR. PAINTER: No, not last time. Not the first trial, no, sir.

MR. McSHEEHAN: This is the psychiatrist that saw him in an eleven month period at state mental hospital in Milledgeville, Georgia.

THE COURT: Was it your opinion that it would not be to his benefit to call him to trial?

Mr. PAINTER: Man had no recollection at all of having treated Mr. Prevatte.

Mr. McSHEEHAN: And he said he would check his records, Judge. And if he found records that were different, he would call us. We'd be glad to subpoena him if the court would allow us the expense of the trip, bring him up. But—

THE COURT: Given the fact you did what he's requested that you did previously; is that correct?

Mr. PAINTER: On April 12th, yes, sir. We went down there and talked to the psychiatrist to prepare him for coming up here to trial.

. . . .

THE COURT: But any agreement about the transfer of this case to Stanly County?

Mr. PAINTER: There was a discussion between us and the D.A. and we broached it with Mr. Prevatte.

THE COURT: Been no agreement about that one way or the other?

Mr. PAINTER: No. There was discussion.

Mr. PREVATTE: Your Honor, if I may. I have no animosity against these attorneys. I just—if I could speak to you in chambers, you would understand why that I told—asked them to do certain things, they haven't done that's in regard to my case and in my best interest. They went down there and talked to this psychiatrist. They said he don't remember nothing about me. I find that hard to believe. I mean, I don't—he may have said that. I'm not saying they lied.

. . . .

THE COURT: You hope to get in touch with him again?

Mr. PAINTER: Yes, sir. We'll be glad to take the records down there. We'll be glad to take a photograph of him. We'll be glad to take whatever criminal records are available made to peak his memory or cause his memory to fire, hopefully, so he'll understand.

**STATE v. PREVATTE**

[356 N.C. 178 (2002)]

THE COURT: How much time have you spent preparing for this case?

MR. McSHEEHAN: First time?

MR. PAINTER: 637 hours is what we had in the last case, first time we tried it.

MR. McSHEEHAN: Over 600 hours counting trial?

MR. PAINTER: Yes, sir. It was six witnesses for trial.

MR. McSHEEHAN: Eight witnesses.

MR. PAINTER: Eight witnesses.

THE COURT: So you spent over 300, 350 hours investigating everything?

MR. PAINTER: We went to Arkansas.

. . . .

THE COURT: Well, knowing you gentlemen as I do and your— shall we call it propensity to investigate I've seen in the past, definite for me to believe that you wouldn't have done everything that's necessary to provide the defense for this man.

MR. PREVATTE: Your Honor, that was in the last trial. I'm speaking of the trial from beginning now. I've asked them to petition the court for funds to hire a private investigator to get this evidence. Up to the time in July when we talked and said, you might be going to court, they hadn't done it. Their reasons for not wanting that evidence brought out is totally ridiculous. The reasons I can't say in front of here because of the prosecution. Go there in Your Honor's chambers, I could tell you. It's a parody to my case that, you know, to help me. And I don't want the prosecution to have any knowledge of it.

THE COURT: About you wanting to have a private investigator?

MR. PREVATTE: Sir?

THE COURT: About why you should have a private investigator?

MR. PREVATTE: I want to petition the court to get a private investigator to look for this evidence, to find it.

STATE v. PREVATTE

[356 N.C. 178 (2002)]

THE COURT: It's not automatic. Do you understand that?

MR. PREVATTE: Yes, sir, I know that. But they didn't even petition for it. In my opinion, they didn't even try. Your Honor, I'm on trial for my life. And I need all the support that I can get from my attorneys. I know these attorneys are good people, good men, good attorneys. But I know a little bit about my case that they don't, and—

THE COURT: Let me ask you something. Did they do everything you thought they should have done in the first trial?

MR. PREVATTE: No, sir. And I ended up with the death penalty.

THE COURT: All right.

MR. HONEYCUTT: I would just like the court to inquire of defendant if he's attempting to fire his attorneys. Is that issue before the court? Because if I understand the law, he has a right to fire his lawyers. But I also understand my best recollection with the appellate decisions are, indigent defendant does not have a right to fire his attorneys just because he doesn't think he's getting along with them. See that's a—there's a much more objective issue before the court other than the clash of personalities.

THE COURT: I understand that.

MR. HONEYCUTT: But I'd like the record to reflect whether or not he's attempting to fire his lawyer.

MR. PREVATTE: Your Honor, the motion was filed to dismiss counsel. I know no lawyer likes to face that kind of a motion. And like I said, I have nothing against these two gentlemen, other than some things that needed to be brought to the court's attention that could have kept me from getting the death penalty, or even convicted of, found guilty the first time. They've ignored it. They—I just want them to do like I ask in this situation, because I know what I'm talking about.

THE COURT: In other words, you just want them to do everything you tell them to do?

MR. PREVATTE: No, sir. I'm not an attorney. I'll be the first to admit that. I don't—I need a—I need counsel. But I'm saying, I don't need these two counsel.

THE COURT: You just want substitute counsel; is that right?

MR. PREVATTE: Court appointed.

THE COURT: You're not asking to dismiss all attorneys, you just want a substitute attorneys?

MR. PREVATTE: No, sir. I was wanting that the court appoint me new counsel.

THE COURT: That's what I'm saying. You want me to dismiss these two gentlemen and appoint two more; is that right?

MR. PREVATTE: Yes.

THE COURT: Anybody care to be heard further? All right, motion is denied. . . .

MR. GWYN: Your Honor, while we're all here, we also have their motion for a change of venue.

. . . .

MR. MCSHEEHAN: We haven't asked to put it on, Judge. . . .

. . . .

MR. HONEYCUTT: Well, we need to hear the motion for change of venue, because I'm trying to get a session set.

. . . .

THE COURT: Well, they didn't know if they were going to be his attorneys until after today or not. So I'm going to set it for the next term in Anson County.

In an order entered on 11 September 1998, the trial court calendared this case to be tried at the 12 October 1998 term in Anson County. The trial court found that the pending motions, such as the change of venue, were not heard on this day because of the illness of one of defendant's attorneys. The trial court then calendared all pending motions in this case to be heard at the 14 September 1998 term.

On 16 October 1998, defendant filed a motion for funds to conduct a survey, asking the court to enter an order approving funds to hire someone to conduct a survey of a cross-section of the citizens of Anson, Union, Stanly, and Richmond counties to determine whether defendant could receive a fair trial in the twentieth prosecutorial dis-

trict. Defendant alluded to the fact that he might argue for a change of venue to remove his case to a county outside of the twentieth prosecutorial district due to publicity.

On 19 October 1998, a hearing was held in Anson County on defendant's motion for change of venue and motion for funds to conduct a survey. Defendant and both of his attorneys were present in the courtroom.

At the hearing, defendant's counsel introduced the transcript of the jury *voir dire* during the first trial. As a result, the following colloquy took place:

THE COURT: What page do you want me to look at?

MR. MCSHEEHAN [defense counsel]: Judge, you'll find them highlighted as you go through, as you look at this. Primarily what our argument is that out of 100 people summoned that came in to sit on the jury, 85 were excused. . . . We're asking to introduce the transcript to show to the Court that out of the 100 plus or so jurors that were summoned, over 85 of them were excused and of those excused more than half of those excused, especially those excused that we were able to either excuse by cause or take them off peremptorily because they had an opinion about this particular case. That's as good a survey on an independent basis as we could possibly ask to find that he can't get a fair and impartial trial in Anson County.

The District Attorney, the last time we had another motion that Mr. Prevatte had filed, said that he didn't object to transferring it to any county in the 20th Judicial District. He said that in open court.

    . . . .

THE COURT: What is your position about transferring?

MR. HONEYCUTT [prosecutor]: First of all, we say they have not met their burden of proof.

THE COURT: I understand.

MR. HONEYCUTT: Adequate facilities and a docket that's light enough in this district is in [Stanly] County, and they rejected that the last time we discussed this.

    . . . .

THE COURT: Is there any objection to moving it to a county in the district that can handle it facility-wise and scheduling-wise?

MR. HONEYCUTT: I just want to get the case tried. I want it in front of 12 people so we can try it.

THE COURT: I understand. Jury selection might go faster if it were in a separate county.

MR. McSHEEHAN: Yes, sir. It took a little over two weeks to get the jury the last time.

. . . .

MR. McSHEEHAN: And we didn't take as much time with the jury, perhaps as the State did, based on the questions.

Judge, we ask to move under statute [15A-957] that the court has the discretion to move it to another county in the same prosectorial district as defined in [statute 7A-60] or to another county in an adjoining district as defined in [7A-60].

Judge, for the convenience, for the ability to have Mr. Prevatte at hand, the best jail facility that we have is in Union County.

THE COURT: We're swamped with cases as it is.

MR. McSHEEHAN: Well, I don't want to make an argument that somebody ought to change the venue on some of those, but regardless—well, that's—

THE COURT: We don't have enough courtrooms now to accommodate all the courts.

MR. McSHEEHAN: This Court may remember that in that discussion that we had when Mr. Honeycutt said he didn't mind any of the districts, we were asked if we wanted to move it to [Stanly] and we said no—Mr. Prevatte said no. I know Richmond and Union are within our district, or any other choice that the Court might deem appropriate in moving it.

. . . .

THE COURT: How long has it been since it was tried the first time?

Mr. McSheehan: We tried it, I believe, in January of 1997, so it will be—it will be four years in January, Judge. Well, so we're asking you to change the venue and I'll stop with this.

. . . .

Mr. Honeycutt: I would like to make a couple of brief comments. First of all, Judge, as I recall when we tried this case in January of 1995, the publicity was not extensive. There was very low coverage from the Charlotte press, outside of him having been previously convicted of a first-degree murder and been sentenced to death and that was—and then he was paroled. That was more the angle.

Most importantly as I recall reading the newspaper articles that did come out, especially in the Anson newspaper, it only comes out once a week, is that correct? Once a week. The coverage was factual. The coverage—the things that were reported were things that happened in the courtroom. There's been no sensationalism of the case. There was no misrepresentation of the evidence that was presented in the case.

We contend that they've not even begun to meet a pattern which would suggest that they could not get a fair trial in Anson County. As for the jurors that were removed for cause, if I do recall properly, it did take almost two weeks to pick a jury, but there were many, many jurors who did not believe in the death penalty and who were not able to qualify. . . .

. . . .

. . . We contend they have not made a case for moving the case out of Anson County, but if the Court wants to move it, you have the discretion to do that. We ask that it remain in the district. I spent all the time in Hampton Inns this year that I would like to. I would like very much to get this case tried as soon as possible. We've postponed it from last spring for the defense attorneys, and then this October postponed it for the defense attorneys. It's time—it's time for this man to have to face the bar of justice.

. . . .

The Court: As to the motion to dismiss, it's my opinion that the showing does not meet a level necessary to require removal to another county as set forth in the State v Barns, and some

other fairly recent decisions. In my discretion I'm going to move it to [Stanly] County if there's no objection from the State.

MR. GWYN [prosecutor]: No objection.

THE COURT: We'll find people there who have not heard much of anything about the case and jury selection will probably go faster being in a different county instead of the one that we're presently in.

Since there's no argument from the State as to that point and are agreeable to it, in my discretion I'm going to allow the motion to move it there, not because a matter of law necessitates it but because of the consent expressed by the State.

As a result of the 19 October 1998 hearing, the trial court entered its order on 1 December 1998 denying defendant's motion for funds to conduct a jury survey, but granting defendant's motion for a change of venue and moved the case to Stanly County. The court found the following facts:

1. That [throughout] the hearing of defendant's motions, the defendant was personally present in open court and accompanied at all times by both his court appointed attorneys, David McSheehan and John Painter.

2. That upon consideration of the motions file[d], evidence presented, and arguments presented, or counsel the court finds that the defendant failed to present a sufficient showing of prejudice requiring the court to grant either the defendant's motion for change of venue or for funds to conduct a jury survey.

. . . .

4. In its discretion, however, and at the request of the defendant the court hereby grants the defendant's motion for a change of venue.

Next, defendant contends the trial court lacked the statutory authority and the inherent authority to change venue without giving an adequate reason. The statute for a change of venue provides:

If, upon motion of the defendant, the court determines that there exists in the county in which the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial, the court must either:

(1) Transfer the proceeding to another county in the prosecutorial district as defined in G.S. 7A-60 or to another county in an adjoining prosecutorial district as defined in G.S. 7A-60, or

(2) Order a special venire under the terms of G.S. 15A-958.

The procedure for change of venue is in accordance with the provisions of Article 3 of this Chapter, Venue.

N.C.G.S. § 15A-957 (2001). We agree that the trial court found that defendant failed to present a sufficient showing of prejudice to change venue, but we disagree that the trial court lacked the inherent authority, in its discretion, to change venue.

It is well settled that "[n]otwithstanding this apparent statutory limitation upon the power of a court to order a change of venue, a court of general jurisdiction . . . has the inherent authority to order a change of venue in the interests of justice." *State v. Barfield*, 298 N.C. 306, 320, 259 S.E.2d 510, 524 (1979) (citing *English v. Brigman*, 227 N.C. 260, 41 S.E.2d 732 (1947)), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). "In either case, a motion for a change of venue is addressed to the sound discretion of the trial judge and will not be disturbed on appeal in the absence of a showing of an abuse of discretion." *Id.* A judge of a superior court "on his own motion, in his own discretion and in the furtherance of justice, has the authority to transfer a case from one county to another," *State v. Chandler*, 324 N.C. 172, 183, 376 S.E.2d 728, 735 (1989) even in the absence of express statutory authority. "Such power existed at common law, and, therefore, unless specifically denied by statute, still adheres in the courts of the country." *Brigman*, 227 N.C. at 261, 41 S.E.2d at 732. "These statutory limitations on the power of a court to order a change of venue are preempted by the inherent authority of the superior court to order a change of venue in the interest of justice." *Chandler*, 324 N.C. at 183, 376 S.E.2d at 735 (citing *Barfield*, 298 N.C. 306, 259 S.E.2d 510).

In the instant case, the trial court used its sound discretion and evoked its inherent authority to change venue in the interest of and furtherance of justice. The trial court was fully aware that defendant had been previously sentenced to death in Anson County. Because of the previous problems choosing jurors in Anson County and the accompanying publicity, defendant requested that venue be changed from Anson County. The trial court granted this request on 23 November 1998. From our review of the record, it is clear that the

trial court was making a decision at defendant's request to benefit defendant in his upcoming trial. It is clear from the record that the prosecution wanted to keep this case in Anson County and that the trial court prevailed upon the prosecution to consent to a change of venue to Stanly County. It is also clear from the record that the trial court took into consideration whether there were adequate facilities and manageable dockets in the other counties. The trial court determined that there would be less publicity in Stanly County and that jury selection would proceed at a faster rate. We hold that the trial court's decision was without error, structural or otherwise.

Next, defendant argues that he did not waive his right to venue, i.e., his right to be tried in Anson County. Defendant filed a motion for a change of venue, but now contends he did not want the change to be Stanly County. Defendant does not have the right to change venue to the county of his choice. At the hearing for a change of venue, defendant's attorney specifically asked not to have the case tried in Anson County, agreed that jury selection would go faster in another county, and noted that the best jail facility was in Union County. Defendant was present in the courtroom during the hearing and voiced no opposition to any of the arguments posed. Defendant had been very vocal on other occasions, but remained silent at this hearing. He made no objection to any arguments during this hearing and, in fact, made no comments at all. He never withdrew or repudiated his motion to change venue. This argument is without merit.

Defendant next contends that he is entitled to a new trial because he and his attorneys came to an impasse about venue and because his attorneys refused to follow defendant's directions. We have previously cited to the transcript of the hearing held on 24 August 1998 in which defendant explicitly refers to his right to direct his attorneys when they reached an impasse:

> MR. PREVATTE: And I know what's—some of the things that need to be done. I've told them, and they won't do it. And it all—the law—the law states that when a defendant and his counsel come[] to an impasse, that the defendant's desires override those of his counsel. I've read that in the North Carolina laws and procedures.

We disagree and hold that defendant's arguments are misplaced.

"[W]hen counsel and a fully informed criminal defendant client reach an absolute impasse as to such tactical decisions, the client's

wishes must control . . . ." *State v. Brown*, 339 N.C. 426, 434, 451 S.E.2d 181, 187 (1994) (quoting *State v. Ali*, 329 N.C. 394, 404, 407 S.E.2d 183, 189 (1991)), *cert. denied*, 516 U.S. 825, 133 L. Ed. 2d 46 (1995). As previously noted, defendant had filed his motion for change of venue from Anson County. After a thorough review of the record, it is apparent that defendant did not want to be tried in any county in the twentieth prosecutorial district. Assuming, *arguendo*, that there was an impasse between defendant and his attorneys, and assuming it was an absolute impasse, defendant's arguments are misdirected. The impasse was between defendant and his attorneys about whether or not to have venue changed to Stanly County. In a motion for change of venue, the trial court determines whether a move to a different county will take place. Relief pursuant to a motion for change of venue may consist of the trial court transferring the trial either to another county in the same prosecutorial district or to another county in an adjoining prosecutorial district. *See* N.C.G.S. § 15A-957(1).

A defendant may not condition a motion for a change of venue upon the trial court's agreeing to transfer the case to a particular county specified by the defendant. In addition, the record does not support defendant's allegations about his defense counsel directing the venue choice or making efforts to change venue to Stanly County. As noted before, the hearing on the motion was the critical time for defendant to have declared any disapproval, repudiation, or withdrawal of the motion. Defendant has no right to dictate the choice of a new county or to exclude some county from those to be considered by the trial court. Neither his attorneys nor the trial court violated defendant's rights with respect to venue. This assignment of error is overruled.

**[2]** Defendant also assigns error to the trial court's failure to allow defendant's personal request to speak to the court outside the presence of the prosecution regarding his *pro se* motion to dismiss his attorneys.

Initially, defendant wrote the court to move for dismissal of his counsel. During the 24 August 1998 hearing on defendant's motion, defendant asked to speak to the court *ex parte* to explain the problems with his counsel to the court. The court did not agree to this request. The State refused to agree that it would not use defendant's statements during the hearing against defendant. Defendant indicated that the general basis of his complaint was that his attorneys had failed to meet several of his requests. Defendant told the judge

that the reasons his attorneys did not want "that evidence brought out is totally ridiculous. The reasons I can't say in front of here because of the prosecution."

Defendant now argues his attorneys could not openly speak absent an *ex parte* hearing because they were constrained by the attorney-client privilege. Defendant thus argues the trial court's failure to grant an *ex parte* hearing violated his Fifth, Sixth, and Fourteenth Amendment rights. Essentially, defendant argues the trial court's action put him in an impossible situation wherein if he revealed the necessary information concerning his attorneys' alleged ineptitude, this information would also be revealed to the prosecution, who could use it against defendant at trial. If defendant failed to reveal the information, however, he would be unable to support his motion for new counsel.

As the State aptly points out in its brief, although defendant cites several assignments of error, defendant presents arguments only on the issue of whether the trial court erred in failing to grant an *ex parte* hearing in the present case. As such, this is the sole issue here, and all other assignments of error are deemed abandoned. *See* N.C. R. App. P. 28(a).

A full review of the pertinent portions of the record is necessary to understand what was at issue during the hearing. Defendant spoke at great length at the hearing; defendant's attorneys also spoke in response to the trial court's inquiries. Defendant's attorneys indicated their reluctance to speak absent defendant's waiver of the attorney-client privilege. After defendant acknowledged that his attorneys had already prepared his case at a prior trial, the trial court asked defendant what additional actions needed to be taken. Defendant replied,

> There's new evidence. There's not new evidence, but evidence that's been out there to prove that the State's main witness lied and made a deal with the D.A. to get 18 felonies dropped a month right after I was convicted. Not only did [the State] lie to the defense, he lied to the court and said he hadn't made a deal with the State witness.

The trial court then asked if this was not the reason defendant's initial conviction had been reversed. *See Prevatte*, 346 N.C. 162, 484 S.E.2d 377. Defendant agreed and added, "But I'm also saying there's other evidence there to show that he lied." When the trial

court asked defendant what additional evidence he thought existed, defendant stated he would prefer to elaborate on the information in the judge's chambers. Although defendant's attorneys stated they could continue to fully represent defendant, defendant still insisted he and his counsel were at an impasse concerning certain issues of trial preparation. Among other things, defendant indicated that he had asked his counsel to petition the court for funds to hire a private investigator to find evidence and that counsel had failed to do so for "ridiculous" reasons.

Additional light is shed on the present issue by examination of a letter defendant wrote to another judge shortly after the hearing. Defendant specifically indicates at the start of the letter that he was writing it in reference to the 24 August 1998 hearing on the motion to dismiss counsel. In the letter, defendant referred to the trial court's questioning during the hearing about the nature of the evidence in issue. He stated that the evidence would show the witness in the first trial (Jeffrey Burr) lied in his testimony from beginning to end. Further, defendant asserted that the location of two bullets at the murder scene would prove that the witness' testimony was false. Specifically, according to the letter, two law enforcement officers (Hutchinson and Poplin) inserted false evidence of the bullets into the record at defendant's first trial.

Also in his letter, defendant said his attorneys had repeatedly ignored his requests to seek funds for a private investigator to locate this evidence. According to the letter, this is one of the reasons defendant wanted his attorneys dismissed. Defendant concluded his letter with a request that the trial court share the letter with defendant's attorneys in the hope they would then obtain a private investigator. Defendant's letter was later discussed at an October 1998 hearing on some of defendant's other motions. After discussion of the letter, the trial court allowed an oral motion by defendant's counsel for funds for someone to further investigate the issue.

Accordingly, defendant did eventually obtain what he sought from his attorneys. Moreover, because neither the two officers, Hutchinson and Poplin, nor the prior witness, Jeffrey Burr, testified at defendant's new trial, it appears defendant's concerns about this issue may have been unnecessary. Instead, the primary issue during the guilt/innocence phase of the trial appears to have been defendant's mental state at the time of the killing. It thus appears the primary matter about which defendant desired to speak with the trial court in private was resolved.

Our review of the record reveals the trial court properly handled defendant's motion for new counsel. An indigent defendant has no right to replace appointed counsel merely because the defendant is dissatisfied with the present attorney's work or because of a disagreement over trial tactics. *State v. Anderson*, 350 N.C. 152, 167-68, 513 S.E.2d 296, 306, *cert. denied*, 528 U.S. 973, 145 L. Ed. 2d 326 (1999); *State v. Kuplen*, 316 N.C. 387, 396-97, 343 S.E.2d 793, 799 (1986). An attorney, whether retained or appointed,

> is not the mere lackey or "mouthpiece" of his client. He is in charge of and has the responsibility for the conduct of the trial, including the selection of witnesses to be called to the stand on behalf of his client and the interrogation of them.

*State v. Robinson*, 290 N.C. 56, 66, 224 S.E.2d 174, 179 (1976). When a defendant makes a motion for new counsel, if it appears the present attorney is reasonably competent and there is no conflict between attorney and client that renders the attorney incompetent, the motion for new counsel must be denied. *Anderson*, 350 N.C. at 167, 513 S.E.2d at 305-06.

In the present case, the trial court properly granted defendant a hearing so defendant could explain his desire to change attorneys. Defendant failed to provide the trial court with sufficient information to support his motion for new counsel. Because defendant's attorneys did eventually agree at the October 1998 hearing to obtain money for a private investigator, it does not appear defendant and his attorneys ever reached an impasse such that the attorneys could not competently function. Moreover, it was certainly within the attorneys' discretion to use their time and energy as they saw best to prepare for trial. In this case, the attorneys may have seen preparation of an insanity defense, rather than pursuit of the evidence defendant sought, as the best way to proceed. Accordingly, based on the evidence presented, the trial court properly denied defendant's motion for new counsel. *See State v. Sweezy*, 291 N.C. 366, 373, 230 S.E.2d 524, 529 (1976) (motion properly denied where "[d]efendant merely stated that he *felt* that his counsel were not *going* to represent him properly without pointing to any act or omission indicating incompetency or lack of diligence on the part of his counsel").

Defendant nonetheless insists he needed an *ex parte* hearing to disclose the information supporting his motion. Defendant failed to provide the trial court, however, with even a minimal basis to grant such an *ex parte* hearing. A trial court does not have to automatically

hold an *ex parte* hearing in circumstances such as those presented in the present case. *See State v. White*, 340 N.C. 264, 276, 457 S.E.2d 841, 848 (no *ex parte* hearing was required on defendant's motion for funds to hire private investigator), *cert. denied*, 516 U.S. 994, 133 L. Ed. 2d 436 (1995); *State v. Phipps*, 331 N.C. 427, 450-53, 418 S.E.2d 178, 190-92 (1992) (no right to *ex parte* hearing on motion for funds for fingerprint expert). *But see State v. Ballard*, 333 N.C. 515, 519, 428 S.E.2d 178, 180 (*ex parte* hearing was needed for motion requesting assistance of psychiatric expert because this issue was "one of an intensely sensitive, personal nature"), *cert. denied*, 510 U.S. 984, 126 L. Ed. 2d 438 (1993). Despite the trial court's attempt in the present case to discuss with defendant what issues prompted his motion, defendant failed to present any evidence that an issue of a personal nature, as in *Ballard*, was at stake. Indeed, defendant merely mentioned to the trial court his desire to speak to the trial judge alone. Even if defendant's comments are given the broadest possible reading, defendant merely indicated that additional evidence might exist. In short, defendant offered no evidence of his need to reveal information at the hearing that would have been useful to the prosecution or that would have otherwise needed secret presentation. Rather, similar to *White* and *Phipps*, defendant apparently wished only that his attorneys would seek funds to obtain physical evidence. As such, defendant failed to show an *ex parte* hearing was needed.

Finally, because we hold that defendant's motion for new counsel was handled properly, we also reject defendant's equal protection claim.

Defendant's assignment of error is without merit.

[3] In another assignment of error, defendant argues his Sixth Amendment right to counsel was denied when his attorneys violated their duty of loyalty and freely revealed their work product in front of the prosecution. During the 24 August 1998 hearing on defendant's motion to dismiss his attorneys, the trial court questioned defendant's attorneys about their representation of defendant. According to defendant, his attorneys improperly revealed their work product concerning trial strategy and undermined defendant's case. Defendant argues that an actual conflict of interest developed between defendant's interest in effective representation and his attorneys' interest in their professional reputation. Moreover, defendant alleges the trial court improperly allowed the State to be involved in the consideration of whether defendant's counsel was adequate.

A criminal defendant has a right to representation free from conflict. *State v. Bruton*, 344 N.C. 381, 391, 474 S.E.2d 336, 343 (1996). To prove a violation of this right, a defendant must show that the conflict affected his attorney's performance at trial. *Id.* In the present case, defendant argues his attorneys revealed trial strategy at the pretrial hearing and thus undermined his defense at trial.

As a preliminary matter, upon this Court's extensive review of the 24 August 1998 hearing, we find no evidence that defendant's attorneys revealed any information that constituted work product. Rather, the attorneys simply responded to the trial court's questions concerning what they had done to investigate and prepare the case. Because the attorneys described in general terms what had been done, rather than disclosing any of their mental processes, there was no work product violation. *See State v. Hardy*, 293 N.C. 105, 126, 235 S.E.2d 828, 841 (1977) ("The [work product] doctrine was designed to protect the mental processes of the attorney from outside interference and provide a privileged area in which he can analyze and prepare his client's case.").

At the hearing, defendant's attorneys disclosed that they had made trips to other states, interviewed a psychiatrist in Georgia who treated defendant, and expressed a willingness to return for an additional visit with the psychiatrist. The attorneys also indicated they had interviewed every witness defendant wished, had investigated defendant's apprehension in Arkansas, and were prepared to impeach a witness whose prior testimony might have been in exchange for dismissal of charges against the witness. The attorneys also informed the trial court that they had discussed with the State transferring the case to Stanly County but had not reached any agreement.

Defendant's attorneys disclosed no information at the hearing that revealed their defense strategy. Indeed, defendant has failed to show how his trial would have differed were it not for his attorneys' statements at the hearing. Defendant's attorneys simply answered the trial court's questions, as they were required to do as officers of the court, in as responsible a manner as possible to aid in the consideration of defendant's motion to dismiss his attorneys.

[4] Defendant also argues the State was improperly allowed to participate in the decision on defendant's motion to dismiss his attorneys. Defendant cites the following exchange at the hearing:

**STATE v. PREVATTE**

[356 N.C. 178 (2002)]

THE COURT: Well, what's your position as to whether or not these attorneys ought to remain in the case, whether or not some other attorney ought to be in it?

[THE STATE]: Well, Your Honor, the defendant doesn't have the right to pick and choose whatever counsel he prefers to have or is more comfortable to have. We really feel, quite frankly, Your Honor, that the purpose of him filing this motion is simply for the purpose of delay. One alternative that occurs to the State is for the appointment of standby counsel in the form of Mr. Painter and Mr. McSheehan. Other than that, we take no position. We just want the court to be aware of our belief that Mr. Prevatte's motion in front of you is simply for the purpose of delaying and putting off the inevitable trial.

The State's comments merely reflect its interpretation of the law governing defendant's motion as well as its belief that defendant was attempting to stall his trial. Because the timing of the trial could have affected the State, it was proper for the trial court to ascertain the State's stance on defendant's motion.

This assignment of error is overruled.

[5] In another assignment of error, defendant contends the trial court erred by granting the State's request for discovery of defendant's medical and psychological records and by requiring the defense's psychology experts to issue written reports in violation of N.C.G.S § 15A-905, which provides in pertinent part:

Reports of Examinations and Tests.—If the court grants any relief sought by the defendant under G.S. 15A-903(e), the court must, upon motion of the State, order the defendant to permit the State to inspect and copy or photograph results or reports of physical or mental examinations or of tests, measurements or experiments made in connection with the case, or copies thereof, within the possession and control of the defendant which the defendant intends to introduce in evidence at the trial or which were prepared by a witness whom the defendant intends to call at the trial, when the results or reports relate to his testimony. In addition, upon motion of a prosecutor, the court must order the defendant to permit the prosecutor to inspect, examine, and test, subject to appropriate safeguards, any physical evidence or a sample of it available to the defendant if the defendant intends to

offer such evidence, or tests or experiments made in connection with such evidence, as an exhibit or evidence in the case.

N.C.G.S. § 15A-905(b) (2001).

Defendant argues the first requirement of the statute was not met because he never requested any results or reports in the State's possession. Defendant argues this is the proper interpretation of the statute despite the fact that the State was entitled to discovery of the material at issue in defendant's first trial.

Our examination of the record reveals defendant never objected during the hearing to the discovery in issue. Indeed, defendant actually conceded that the State had properly interpreted the applicable law granting the State the right to discovery.

At a pretrial hearing on 13 July 1998, the State asked the trial court to order, as it had in defendant's first trial, that defendant permit the State to copy results or reports of all psychological examinations of defendant that defendant intended to offer into evidence at trial. In response, one of defendant's attorneys stated, "They're entitled to it if we intend to offer it. That's what I understand the law is." The trial court then entered an order requiring defendant to notify the State of any mental health or similar report defendant intended to use. Defendant's counsel responded to the trial court's oral order by saying, "Yes, sir."

Defendant never objected to the trial court's grant of the relevant discovery to the State. Indeed, as indicated above, defendant agreed that the law gave the State the right to obtain the materials requested. As such, defendant has failed to preserve this issue for appellate review and, having conceded the issue at trial, cannot properly raise it here. *See* N.C. R. App. P. 10(b)(1).

Defendant's assignment of error is overruled.

## JURY SELECTION

[6] In another assignment of error, defendant contends the trial court erred by denying defendant's motion to strike the panel of jurors that heard prospective juror Mabry's comment that she recognized a mug shot of defendant in the paper. The following portion of jury selection is relevant:

[THE STATE]: . . . Because this did receive some attention from the press. Do any of you all recall those circumstances or that murder or this case?

(Jurors shake their head[s] negatively.)

[THE STATE]: Okay.

MS. MABRY: I do recognize his mug shot that was in the paper. I mean, I remember that picture.

[THE STATE]: Okay. When did that appear in the paper?

MS. MABRY: Well, I'm not quite sure. But maybe I pictured him somewhere else. But I remember we—we discussed his mustache.

[THE STATE]: Okay. Are we talking about a matter of years ago?

MS. MABRY: Yeah.

[THE STATE]: Or are we talking about recently?

MS. MABRY: It wouldn't be recent.

[THE STATE]: Because I wasn't aware that it had been in the paper recently.

MS. MABRY: It wouldn't be recent.

[THE STATE]: I misunderstood and thought that you meant recently.

MS. MABRY: No. I just remember the mustache.

[THE STATE]: He looks familiar now that you've had a chance to look at him a little bit?

MS. MABRY: Right.

[THE STATE]: Now, do you recall, Ms. Mabry, whether or not when you saw his picture in the paper, forming an opinion about this case?

MS. MABRY: That was a while back. I wouldn't—I don't remember.

[THE STATE]: Okay. If you formed an opinion about that—this case, would you hold that opinion now. Or are you, as you sit here today, without opinion about this case, open minded and fair?

MS. MABRY: Open minded.

**STATE v. PREVATTE**

[356 N.C. 178 (2002)]

[THE STATE]: Okay. You have no opinion about the guilt of Mr. Prevatte as he sits here today?

MS. MABRY: No.

[THE STATE]: Okay. And you don't feel like the fact that you saw his name in the paper—which we've acknowledged that he got some press attention. The fact that you saw his picture in the paper would prevent you from being fair and impartial in this case?

MS. MABRY: No.

[THE STATE]: Okay. All right. Anybody else?

(Jurors shake their head[s] negatively.)

Mabry was eventually excused for a reason unrelated to defendant's picture appearing in the paper. Defendant argues the information about the mug shot allowed the other jurors to speculate about prior crimes defendant may have committed.

First, defendant provides no evidence that the mug shot that Mabry saw was connected to another crime. The murder in issue was committed over five years prior to the trial and so the mug shot certainly could have been related to that crime.

Second, there is no reason to believe the other jurors formed any improper opinions based on Mabry's comment about the mug shot. In *State v. Corbett,* we considered a prospective juror's remark that he had been following the case in the paper and had formed an opinion that the defendant was guilty. 309 N.C. 382, 385, 307 S.E.2d 139, 142 (1983). The defendant argued this remark prevented the remaining jurors from exercising their own judgment. *Id.* at 386, 307 S.E.2d at 143. This Court held it was the defendant's burden to show a juror held an improper opinion. *Id.* Moreover, this Court stated:

Defendant has failed to establish that the mere fact that one prospective juror who was later excused for cause stated that in his opinion defendant was guilty caused the remaining prospective jurors to become unable to render a verdict based on the evidence presented in court. Defendant has presented no evidence that [the prospective juror's] opinion carried *any* weight with the jurors selected.

*Id.* at 386-87, 307 S.E.2d at 143.

STATE v. PREVATTE

[356 N.C. 178 (2002)]

In the present case, unlike *Corbett*, prospective juror Mabry made no comment that she thought defendant was guilty. Instead, she merely mentioned seeing his mug shot in the paper. Further, the trial court instructed the jury numerous times to base its considerations of the case solely on the evidence presented.

Because defendant has failed to show prospective juror Mabry's comment influenced the jury's deliberations, we hold there was no error here.

This assignment of error is overruled.

[7] In another assignment of error, defendant argues the trial court erred by permitting the State's questions during jury *voir dire* which implied that jurors were free to ignore or devalue testimony of psychologists, psychiatrists, and other experts. Defendant failed to preserve this issue for appeal as he did not refer in his assignment of error to all the questions that he addresses in his brief. This Court can review "those assignments of error set out in the record on appeal." N.C. R. App. P. 10(a). To be sufficient, assignments of error must "direct[] the attention of the appellate court to the particular error about which the question is made, with clear and specific record or transcript references." N.C. R. App. P. 10(c)(1); *see also State v. Price*, 326 N.C. 56, 87, 388 S.E.2d 84, 101-02, *sentence vacated on other grounds*, 498 U.S. 802, 112 L. Ed. 2d 7 (1990). Defendant also failed to object to all but two of the questions at trial. When he objected to those two questions, he objected on other grounds.

Regardless of whether defendant preserved this issue, the questions to which defendant objects did not misstate the law. For example, defendant objects to the following comment by the State during jury *voir dire*: "You don't have to believe any part of what an expert witness says, just because that person is an expert witness."

The law in North Carolina is well established that a prosecutor may not express his opinion as to the credibility of a witness. *State v. Riddle*, 311 N.C. 734, 737, 319 S.E.2d 250, 253 (1984). In this case, however, the prosecutor did not express an opinion as to the credibility of specific witnesses. He did not intimate that he thought defendant's experts would lie or that he did not believe defendant's experts. The State's questions during jury *voir dire* were simply intended to determine if jurors would equally consider testimony of lay witnesses concerning defendant's mental capacity.

Before jury deliberations began, the trial court instructed the jury on expert witnesses as follows:

> Now, in this case, you've heard evidence from witnesses who have testified as expert witnesses. Now, an expert witness is permitted to testify in the form of an opinion in a field where he purports to have specialized skill or knowledge. Now, as I've instructed you, you are the sole judges of the credibility of each witness and the weight to be given to the testimony of each witness.
>
> In making this determination as to the testimony of an expert witness, you should consider, in addition to the other tests of credibility and weight, the witness' training and qualifications and experience or lack therefore, the reasons if any given for the opinion, whether the opinion is supported by facts that you find from the evidence, whether the opinion is reasonable, and whether it is consistent with other believable evidence in the case.
>
> Now, you should consider the opinion of an expert, but you are not bound by it. In other words, you are not required to accept an expert witness' opinion to the exclusion of the facts and circumstances disclosed by other testimony.

These instructions were given in accordance with the pattern jury instructions, *see* N.C.P.I.—Crim. 104.94 (1990), and have been approved by this Court, *State v. Kennedy*, 320 N.C. 20, 36-37, 357 S.E.2d 359, 369 (1987). The State's questions regarding expert witnesses were in concert with the trial court's jury instruction. We hold the State's questions were proper.

This assignment of error is overruled.

[8] In another assignment of error, defendant argues the trial court erred by overruling his objections to prosecutorial vouching. Defendant argues the State's comments during jury *voir dire* were unacceptable in that the State vouched to the jury that it was arguing the just and true case. Defendant argues multiple statements by the State were prejudicial. Most of these statements referred to evidence the State would present and to what would occur during the sentencing phase. For example, defendant argues it was error when the State asked a juror the following question:

> Would you also agree, then, that in a case that the State is seeking the death penalty, that as a matter of fairness, the jury

should give some consideration to the death penalty once it reached that point?

At this point, defendant objected to the term "once it reached that point," and the trial court clarified, stating, "Well, if it reaches that point."

Defendant further argues the following line of questioning by the State was prejudicial:

[THE STATE]: Did you understand that if you are convinced based on the facts of this case and His Honor's instructions on the law, that if you are convinced that the death penalty is the appropriate punishment for that man over there, that would then be your duty to come back and announce that to be your verdict, the death penalty?

. . . .

[DEFENSE COUNSEL]: Object to the form of the question in the manner which it was stated, assumes certain things.

THE COURT: You understand that we may not reach the punishment phase at all. Do you understand that?

[PROSPECTIVE JUROR]: Yes.

THE COURT: Okay. Just necessary to ask these preliminary questions in case we do go into that at a later time.

[THE STATE]: My question . . . was really more whether or not you recognize that it may become—and we say it will become in this case—your duty to find the defendant guilty of first degree murder, and then to announce the death penalty as the sentence in that case. It is not an academic or a hypothetical proposition. We're saying you will get there. Do you understand that to be your duty?

[DEFENSE COUNSEL]: Objection. Objection.

THE COURT: It will be your duty to decide the issue one way or the other. Do you understand that?

[PROSPECTIVE JUROR]: Yes.

THE COURT: If it reaches that.

In questioning another prospective juror, the State asked:

Should the defendant be convicted of first degree murder—we contend he will be—and the jury that then hears the sentencing issues decide for itself unanimously by proof beyond a reasonable doubt that the appropriate penalty given the law, given what aggravating circumstances are, and what the mitigating circumstances are, given His Honor's instruction as to those things, that the appropriate penalty is death, do you understand then that it would be your duty to come back and announce that as your sentence recommendation?

. . . .

. . . [I]t's not a hypothetical question I'm asking here. It's not speculative or academic. It's something we contend will happen. So my question of you is not—not hypothetical

. . . .

. . . You understand that that—should we reach that point, that that is going to be what's required of you? That that is part of your—your duty as a juror.

[PROSPECTIVE JUROR]: Yes.

[THE STATE]: Given that certain circumstance.

[PROSPECTIVE JUROR]: I understand.

. . . .

[THE STATE]: Okay. You realize that that is, under your oath, what's going to be required of you should you reach that point.

[PROSPECTIVE JUROR]: (Nods head affirmatively.)

[THE STATE]: All right.

[PROSPECTIVE JUROR]: Yeah.

[THE STATE]: And that the State has a right to a fair trial.

[PROSPECTIVE JUROR]: Yeah.

[THE STATE]: And that as part of a fair trial, should we reach that point, the State has a right for that to happen.

[PROSPECTIVE JUROR]: Yes.

Defendant also argues that comments during questioning of another prospective juror were prejudicial:

**STATE v. PREVATTE**

[356 N.C. 178 (2002)]

[THE STATE]: Do you understand that in a death penalty case, as in any criminal trial, the State, as well as the defendant, are entitled to a fair trial. Okay? Entitled to jurors who will fairly consider both sentencing options. Okay? The death penalty—

[DEFENSE COUNSEL]: Objection.

[THE STATE]: As well as life imprisonment.

THE COURT: What's that?

[DEFENSE COUNSEL]: Improper statement, Judge. They consider the—first a guilt or not guilty in this case before they get to that. And then they consider the evidence presented.

THE COURT: You understand it's a two-part trial and you determine the guilt or innocence of the defendant of the underlying crime first?

[PROSPECTIVE JUROR]: Yes.

THE COURT: Only if he's found guilty do we go into a sentencing phase. Do you understand that?

[PROSPECTIVE JUROR]: (Nods head affirmatively.)

THE COURT: You're asked these questions only in case we get to a second phase. You understand all that?

[PROSPECTIVE JUROR]: Yes, sir.

[THE STATE]: . . . the State contends we're going to get to that point. And that's why these questions are relevant. Do you understand that we're contending that we will get to a sentencing phase, okay? And that's why this is not a hypothetical type situation. That's why this isn't just—

[DEFENSE COUNSEL]: Objection.

[THE STATE]: —exercise.

THE COURT: Overruled.

Defendant argues in several other instances the State overstepped its bounds and prejudiced the prospective jurors.

During jury *voir dire*, as in jury arguments, counsel cannot put incompetent and prejudicial matters before the jury " 'by injecting his own knowledge, beliefs and personal opinions' " when they are unsupported by the evidence. *State v. Gibbs*, 335 N.C. 1, 38-39, 436

S.E.2d 321, 342 (1993) (quoting *State v. Johnson*, 298 N.C. 355, 368, 259 S.E.2d 752, 761 (1979)), *cert. denied*, 512 U.S. 1246, 129 L. Ed. 2d 881 (1994). In *Gibbs*, the defendant argued that during jury *voir dire*, the prosecutor's prefacing of questions with comments about moving from the first stage of trial to the penalty phase were improper and the implication that the penalty phase would be reached was prejudicial. *Id.* at 38, 436 S.E.2d at 342. This Court held that such comments, even when repeated, did not constitute an attempt to put before the prospective jurors "prejudicial matters by injecting [counsel's] own beliefs or personal opinions unsupported by evidence." *Id.* at 39, 436 S.E.2d at 343.

In the present case, the State never said the sentencing phase definitely would be reached, but only insinuated such a possibility. The State's comments, taken in context, "refer to the conditional nature of bifurcated capital prosecutions." *Id.* at 39, 436 S.E.2d at 342. Further, the trial court's clarifications and the prospective jurors' responses to the trial court and to the State made it clear that the prospective jurors were not under the impression the sentencing phase was a certainty. After reviewing all the comments to which defendant objects, we hold these statements were not improper.

Accordingly, defendant's assignment of error regarding prosecutorial vouching is without merit.

**[9]** In another assignment of error, defendant argues the trial court erred by allowing the State to inform prospective jurors that as part of their duty they might have to stand up alone and announce a death verdict. Defendant further argues the trial court erred by excusing prospective juror Thomas because she could not fulfill this duty.

The following transcript excerpt is pertinent to our analysis of this issue:

[THE STATE]: If based on those things, if the State has convinced you, Mrs. Thomas [prospective juror], of the defendant's guilt and the appropriateness of the death penalty as the punishment in this case, do you think that you could come back with that as being your sentence recommendation for the death penalty?

MS. THOMAS: I believe in the death penalty in some cases. But personally, I have a problem with being the one to say—to say, you know, put this man to death.

STATE v. PREVATTE

[356 N.C. 178 (2002)]

[THE STATE]: Well, to be very honest with you, Mrs. Thomas, that's exactly when we're asking members of this jury to do. Do you understand that?

Ms. THOMAS: Yes.

[THE STATE]: And also what we'll be asking, should we get to that point, and we say we will get to that point, not only would you be asked to make up that as your verdict, guilty of first degree murder as well as the two kidnappings, but also the death penalty as being your recommendation. What you would be required to do, ma'am, is to come back into court and stand up all by yourself and announce to everyone in court, including the defendant over there, that the death penalty is your sentence recommendation.

It is only fair that you know that now going in. But that is going to be a part of your duty as a juror in this case, should we reach that point. We contend we will. Now, having heard all that, do you feel that you could do that?

Ms. THOMAS: I'm not sure that I could.

[THE STATE]: You understand that the questions that I've asked are based largely on what would be required of jurors in the case at different points, and that it is not a hypothetical or academic or speculative question on our part in asking if you would be able to do that.

Ms. THOMAS: Right.

[THE STATE]: We need to know yes or no if you could.

Ms. THOMAS: I don't think I could.

[THE STATE]: Do you understand that that is part of what's required?

Ms. THOMAS: Yes.

[THE STATE]: Would the fact that you don't think that you could do that prevent you from, first of all, finding the defendant guilty of first degree murder?

[DEFENSE COUNSEL]: Objection.

[THE STATE]: Knowing that you'd then have to pass upon the sentencing issue?

**STATE v. PREVATTE**

[356 N.C. 178 (2002)]

THE COURT: Overruled.

MS. THOMAS: If I thought he was guilty, I would say guilty.

[THE STATE]: Knowing that you would then have to decide what the sentence should be?

MS. THOMAS: Yes.

[THE STATE]: Knowing that you would also then have to come back into court and do something that you've said you don't think you could do?

MS. THOMAS: Well, I couldn't say that I thought he was not guilty if I thought he was guilty.

[THE STATE]: You understand that part of your obligation as a juror, is to come back in the court and announce whatever sentence recommendation you announce?

MS. THOMAS: Yes.

[THE STATE]: By yourself, one at a time?

MS. THOMAS: Yes.

[THE STATE]: And did I understand you to say that you don't think that you could do that if the sentence recommendation is the death penalty?

MS. THOMAS: That's right.

THE COURT: Is there something about having to stand there and affirm the sentence that bothers you, or that you've got to stand up and say something personally that bothers you, or—

MS. THOMAS: No. It would bother me to stand up and say this man has got to—I've got to make the decision that this man has got to die.

THE COURT: Well, what will happen if the time comes if—if the jury recommends the death sentence, the clerk will read a form that—substantially as follows, that foreman of the jury has returned a recommendation that the sentence—defendant be sentenced to death. And each person on the jury would have to stand individually, and the clerk would say, "Your foreman has returned a recommendation that the defendant be sentenced to death. Is this your recommendation, and do you still assent thereto? Do you still agree to it?" You would be required to say

yes or no. Each of you would be required to stand there and say yes or no, that you agree with it or disagree. Do you understand?

Ms. THOMAS: Yes.

THE COURT: You don't think you could be part of that process?

Ms. THOMAS: (Shakes head negatively.)

THE COURT: Ma'am?

Ms. THOMAS: No, sir.

THE COURT: You understand that would be part of your duty as a juror to go through that if you served on the case?

Ms. THOMAS: Yes.

THE COURT: Are your feelings about that so strong, then, you feel it would impair your ability to be a juror in this case, knowing that that would be part of the process?

Ms. THOMAS: I would have a problem with saying it.

THE COURT: Well, we got to know up front. Not a thing about, you know, I should have let them know this earlier. We need to know before we get into the case.

Ms. THOMAS: I would have to say yes, it would.

THE COURT: That it would impair your ability to be a juror in this case?

Ms. THOMAS: Yes.

At this point, the State challenged for cause, defendant objected and sought to further question the juror, and the trial court overruled defendant's objection.

The standard to determine if a prospective juror may be excluded for cause because of her views on capital punishment was clearly laid out in the United States Supreme Court's decision in *Wainwright v. Witt*, 469 U.S. 412, 83 L. Ed. 2d 841 (1985). The "standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Id.* at 424, 83 L. Ed. 2d at 851-52 (quoting *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589 (1980)). A juror's bias need not be unmistakably clear and there are situations where the trial court

"is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Id.* at 426, 83 L. Ed. 2d at 852.

After a careful review of the transcript, it is clear the trial court and the State thoroughly questioned Thomas about her views. Moreover, regarding defendant's argument concerning jurors' individual ability to announce a death verdict, it appears the State and the trial court were merely describing the polling process for the jurors. Because the trial court perceived an inability on Thomas' part to follow the law with regard to imposition of capital punishment, the trial court, in its discretion, concluded Thomas was not fit to serve on the jury.

This assignment of error is overruled.

## GUILT-INNOCENCE PHASE

[10] In another assignment of error, defendant contends the trial court violated defendant's right to present evidence in his defense. Specifically, defendant argues the trial court erred by failing to allow two expert witnesses, Dr. Daphne Timmons and Dr. Nathan Strahl, to state the bases of their opinions. Further, defendant argues the trial court erred by limiting the testimony of some lay witnesses about defendant's state of mind.

In reviewing defendant's brief, it is difficult to ascertain the exact trial questions defendant argues were erroneously handled. This Court has thus scrutinized each segment of the record purportedly identified by defendant in the relevant assignments of error. We find no error in any of the testimony presented in these portions of the record. Below, we address the portions of testimony to which defendant makes ample argument in his brief.

First, defendant contends the trial court erred in handling the following exchange between Dr. Timmons and defense counsel:

[DEFENSE COUNSEL]: Did you talk to the defendant Ted Prevatte about his actions and how he was feeling and what he was doing immediately up to the time that Cindy McIntyre was killed on June the first of 1993?

[DR. TIMMONS:] Yes.

[DEFENSE COUNSEL]: And relate to the court and the jury what Mr. Prevatte told you in regards to that.

[THE STATE]:  Objection.

THE COURT:  Sustained.

[DEFENSE COUNSEL]:  Well, did you use what Mr. Prevatte told you as far as what he was thinking and what he was feeling and what he was doing immediately prior to the time he went over to Cindy McIntyre's house on June the first of 1993 and formulate and evaluate and make—formulating an opinion as to his sanity or insanity on June the first, 1993?

[THE STATE]:  Objection.

THE COURT:  Sustained.

It is well settled that an expert must be allowed to testify to the basis of her opinion. *State v. Ward*, 338 N.C. 64, 105-06, 449 S.E.2d 709, 732 (1994), *cert. denied*, 514 U.S. 1134, 131 L. Ed. 2d 1013 (1995). Nonetheless, admission of the basis of an expert's opinion is not automatic. *State v. Workman*, 344 N.C. 482, 495, 476 S.E.2d 301, 308 (1996). The trial court, in its discretion, must determine whether the statements in issue are reliable, especially if the statements are self-serving and the defendant is not available for cross-examination. *Id.* Moreover, if the statements appear unnecessary to the expert's opinion, exclusion of the basis may be proper. *State v. Baldwin*, 330 N.C. 446, 457, 412 S.E.2d 31, 38 (1992).

In the present instance, it appears Dr. Timmons was allowed to testify to some of what she was told by defendant and to her review of defendant's psychiatric records as well as her own psychological testing of defendant. Accordingly, it seems Dr. Timmons was able to testify to the general basis of her opinion. Moreover, defendant made no offer of proof concerning the questions in issue; thus, we can only speculate as to the witness' potential responses to the questions in issue. We reject defendant's invitation to consider the transcript from a prior trial in this respect because we cannot know if the witness' viewpoint remained constant from the first to the second trial. Accordingly, we reject defendant's argument that the trial court erred in handling the testimony above.

Defendant also argues that another objection by the State was improperly sustained when defendant elicited testimony that defendant was taking medication and then asked Dr. Timmons about the impact of these drugs on a person with mental illness and whether the combination could affect defendant's ability to maintain contact

with reality. Again, defendant made no offer of proof concerning this question, and this Court can only speculate to the issues that were involved at trial. Moreover, a few questions later, Dr. Timmons was allowed to testify that, on 1 June 1993, defendant was not in touch with reality and thus did not understand that what he was doing was wrong. As such, we cannot ascertain any prejudicial error here.

Defendant further argues that Dr. Strahl, like Dr. Timmons, was also prevented from testifying to the basis of his opinion. For example, according to defendant, Dr. Strahl was limited both in talking about defendant's reported sleeping and the combination of drugs he was taking as well as in explaining the significance defendant's relationship with the victim played in Dr. Strahl's opinion.

As to defendant's sleeping and drugs, defendant's attorney was allowed to ask Dr. Strahl about the drugs and medications that defendant was taking. The State's objection to a question about defendant's sleeping problems was then sustained. The trial court heard arguments outside the jury's presence before making a final ruling. Although defense counsel initially indicated an intent to ask a question for the record, we find no evidence that an offer of proof was ever actually made. Accordingly, it is difficult to tell where this line of questioning was aimed.

As to defendant's relationship with the victim, the trial court also sustained the State's objection and heard arguments outside the jury's presence. Defendant again made no offer of proof. Accordingly, as with prior issues, this Court can only speculate as to how Dr. Strahl's opinion was impacted by the relationship between defendant and the victim. We refuse to enter into such speculation, and therefore hold that the testimony in issue was properly handled by the trial court.

Finally, defendant argues the trial court erred in limiting the testimony of certain lay witnesses concerning defendant's state of mind. Specifically, defendant points to the trial court sustaining objections: (1) to defendant's attorney asking Matthew McIntyre whether defendant was a "very polite man, was out there helping neighbors and things"; and (2) to defendant's attorney asking Ralph Pegram if he had seen defendant "helping Jeff Burr's mom up there cut wood" and "doing things for the elderly folks in the neighborhood." Defendant now argues these questions were relevant to defendant's state of mind. Once again, there was no offer of proof from which this Court can glean the relevancy of these questions. Moreover, it appears

unlikely the observations of these lay witnesses would have substantially impacted the jury's consideration of defendant's sanity. Accordingly, even assuming error *arguendo*, we find no prejudice.

This assignment of error is overruled.

**[11]** In another assignment of error, defendant argues that his attorneys' failure to adequately present psychological defenses constituted ineffective assistance of counsel. Defendant cites the following question posed by defense counsel to Dr. Timmons:

> And based upon your examination of the defendant, the various records and statements about which you've testified, do you have an opinion satisfactory to yourself and based upon your professional training and experience as to whether on or about June the first, 1993, at the time of the alleged offense of first degree murder of Cynthia McIntyre, the defendant Ted Anthony Prevatte was capable of premeditation and deliberation?
>
> [THE STATE]: Objection.
>
> THE COURT: Sustained.

Relying on a transcript from the prior trial, defendant asserts the witness would have said she did not believe defendant was capable of premeditation and deliberation.

Defendant concedes the State's objection was proper because expert witnesses generally may not testify as to whether a legal standard has been met. *See State v. Smith*, 315 N.C. 76, 100, 337 S.E.2d 833, 849 (1985). Defendant argues his counsel failed, however, by not asking the permissible question of whether defendant was capable of formulating and carrying out plans or of forming the specific intent to kill.

To show ineffective assistance of counsel, defendant must prove (1) the performance of his counsel was deficient, and (2) defendant was prejudiced by this deficiency. *See State v. Mason*, 337 N.C. 165, 177-78, 446 S.E.2d 58, 65 (1994); *State v. McHone*, 334 N.C. 627, 643, 435 S.E.2d 296, 306 (1993), *cert. denied*, 511 U.S. 1046, 128 L. Ed. 2d 220 (1994).

In the present case, as the State aptly points out, the hypothetical questions that defendant argues should have been asked would have sought evidence to support a diminished capacity defense. As in the prior issue, however, we can only speculate whether the questions in

issue would have been answered favorably to defendant. There are significant differences between an insanity defense and a diminished capacity defense. *See State v. Ingle*, 336 N.C. 617, 628-30, 445 S.E.2d 880, 885-86 (1994), *cert. denied*, 514 U.S. 1020, 131 L. Ed. 2d 222 (1995). As such, there is no way for this Court to know if defendant's questions would have in fact been helpful to defendant's case.

Assuming *arguendo* that the witness would have offered evidence helpful to a diminished capacity defense, it was still a matter of trial strategy to determine whether to offer evidence of both diminished capacity and insanity or to focus all efforts on insanity. Decisions concerning which defenses to pursue are matters of trial strategy and are not generally second-guessed by this Court. *State v. Lowery*, 318 N.C. 54, 68, 347 S.E.2d 729, 739 (1986). Accordingly, we find no deficiency in the performance of defendant's counsel.

This assignment of error is overruled.

[12] In another assignment of error, defendant argues his rights were violated by the State's attacks on Dr. Timmons and the State's distortion of her testimony during closing argument. Among the specific instances defendant cites are the State calling Dr. Timmons "Mrs. Timmons" during cross-examination, interrupting Dr. Timmons and refusing to allow her to explain her answers, and repeating the same questions after sustained objections. Defendant argues some of the same tactics were used in questioning Dr. Strahl. Defendant argues the State also unprofessionally denigrated the experts' testimony during closing arguments by asking, "What is the legal evidence in this case that supports the testimony of any psychiatrist that you've heard?" Defendant cites the following portion of the State's closing argument concerning Dr. Timmons:

> She gave him a battery of tests. Bunch of tests. Ink blots and trees and stick figures. What was it she said about the stick figures? Showed immaturity? Maybe he just can't draw. Did anybody think of that? A tree that's got bark. Bark shows something. Leaves. Looks like a tree to me.

Defendant also cites the State's statement, "Was it fair when the people who came up here and testified sat here and had words put in their mouth by the defense?" Defendant argues these actions violated state law and defendant's due process rights.

After an extensive review of each portion of the transcript to which defendant assigns error, we find no instance where the trial

court failed to adequately control the State's actions. A prosecutor has the duty to vigorously present the State's case. *See State v. Brock*, 305 N.C. 532, 538, 290 S.E.2d 566, 571 (1982). In so doing, the prosecutor may cross-examine a witness concerning any relevant issue, including the witness' credibility. N.C.G.S. § 8C-1, Rule 611(b) (2001). It is within the trial court's sound discretion to ensure that all cross-examination questions are proper in scope and asked in good faith. *State v. Bronson*, 333 N.C. 67, 79-80, 423 S.E.2d 772, 779 (1992). During closing arguments, attorneys are given wide latitude to pursue their case. *State v. Scott*, 343 N.C. 313, 343, 471 S.E.2d 605, 623 (1996). It is also within the trial court's discretion to control these arguments by each attorney. *Id.* An appellate court normally will not review the exercise of the trial court's discretion "unless the impropriety of counsel's remarks is extreme and is clearly calculated to prejudice the jury." *State v. Huffstetler*, 312 N.C. 92, 111, 322 S.E.2d 110, 122 (1984), *cert. denied*, 471 U.S. 1009, 85 L. Ed. 2d 169 (1985).

This Court takes seriously the need for counsel to perform professionally in pursuing their case. We refuse to permit attorneys to disparage or impugn the trial process with improper actions. *State v. Sanderson*, 336 N.C. 1, 442 S.E.2d 33 (1994). In the present case, however, defendant has failed to show the trial court abused its discretion in handling the State's actions at trial.

This assignment of error is overruled.

[13] In another assignment of error, defendant argues the trial court erred by allowing impermissible hearsay evidence. We consider each of defendant's arguments in turn.

First, the State was permitted to ask Betty Barber about the victim's husband visiting the house on the day of the murder and whether he said "anything to her at that time that you remember?" Over defendant's objection, the witness testified, "I think he told her he loved her."

"Out-of-court statements offered for purposes other than to prove the truth of the matter asserted are not considered hearsay." *State v. Golphin*, 352 N.C. 364, 440, 533 S.E.2d 168, 219 (2000), *cert. denied*, 532 U.S. 931, 149 L. Ed. 2d 305 (2001). In this instance, Mike McIntyre's statement that he loved Cindy was properly admitted for a purpose other than to prove its truth. *See* N.C.G.S. § 8C-1, Rule 801(c) (2001). The statement is evidence that Cindy believed a reconciliation was forthcoming and thus supports Cindy's fear that defendant might

try to harm her or her family. *See State v. Bishop*, 346 N.C. 365, 378-81, 488 S.E.2d 769, 775-77 (1997). Moreover, the statement supports a conclusion defendant was motivated to kill by Cindy's desire to end her relationship with defendant and reconcile with her husband. Accordingly, the trial court properly admitted the testimony in issue for a nonhearsay purpose.

**[14]** Defendant also assigns some significance to Barber later testifying that the relationship between Cindy McIntyre and her husband was "rocky" but that they "always seemed to get back together." According to defendant, this testimony was given without personal knowledge. Defendant concedes this testimony was tested on cross-examination when the witness admitted she did not live with Cindy McIntyre and her husband and thus did not know what she meant by "rocky." Accordingly, we find no prejudicial error here.

**[15]** Second, defendant points to the State asking Joyce Burr, "Did Cindy McIntyre tell you in fact that she was attempting to reconcile with her husband?" Over defendant's objection, the witness answered, "Yes." This testimony was admissible under the state of mind exception to the general prohibition on hearsay. N.C.G.S. § 8C-1, Rule 803(3) (2001). Under this exception, a statement is admissible if it applies to a "declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)." *Id.*

The testimony in issue was immediately preceded by testimony that Cindy McIntyre had said "that she was afraid of the defendant because he knew that she was going to try to get back with her husband." The testimony in issue was an expansion on the origin of the victim's fear of defendant. The statement of the victim's intent to reconcile with her husband shows McIntyre's mental state and provides insight into her confrontation with defendant. Accordingly, the statement is admissible not as a recitation of facts but to show state of mind. *See State v. King*, 353 N.C. 457, 474-78, 546 S.E.2d 575, 589-91 (2001), *cert. denied*, —— U.S. ——, 151 L. Ed. 2d 1002 (2002).

**[16]** Defendant also argues the trial court improperly sustained an objection when defendant asked Ralph Pegram, "[D]id Mike McIntyre ask you to keep an eye on Cindy and Ted so he could use that in court over custody of the kids?" Although defendant made no offer of proof as to the question's potential answer, we nonetheless have tried to review how this question elicited admissible information. We find this

question solicited hearsay and was improper. Accordingly, we hold the trial court did not err.

Finally, defendant contends that even if the statements above were not hearsay, they should have been excluded because they were irrelevant. As we indicated, these statements had a relevant, non-hearsay purpose, and thus were properly admitted.

Defendant's assignment of error is without merit.

[17] In another assignment of error, defendant argues the trial court erred by overruling objections to the State's argument that distorted the legal standard applicable to the insanity defense. While defendant's arguments on this issue involve both jury selection and guilt-innocence, we elect to address the arguments here for purposes of consistency. We again consider defendant's specific arguments in turn.

First, during jury *voir dire*, defendant argues the State asked a jury panel, "Do you all feel that you could follow His Honor's instructions with regard to both defenses? But he's first of all, not guilty at all, period. And that also, he is not guilty by reason of being insane at the time?" According to defendant, his objection was overruled. Defendant argues the State thus misstated the law as cumulative rather than alternative.

Defendant provides no transcript reference in his brief to this statement and we find no assignment of error on this issue. As such, defendant has waived this issue. N.C. R. App. P. 10(a). Nonetheless, we have reviewed this issue and find such a statement would be a proper attempt by the State to ascertain if jurors could follow the law concerning defendant's guilt as well as whether defendant was not guilty by reason of insanity. The trial court properly instructed the jury following the guilt phase. We thus find no error here.

[18] Second, during its closing argument, the State said:

Ted Prevatte most assuredly is not, should not be considered by you to be the poster boy for perfect mental health. Every expert that testified . . . can see to the fact that Ted has some degree of mental health problems.

The difference is, and the question you have to ask yourself is, does that mental illness rise to the level of providing an excuse for him kidnapping two people and murdering one of them? That's what it boils down to.

Defendant argues that in this closing argument, the State essentially asked the jury to make a policy decision about the importance of the insanity rule. To the contrary, the State appears to have been arguing that defendant's mental illness did not alone meet the requirements for legal insanity. *See State v. Franks*, 300 N.C. 1, 10, 265 S.E.2d 177, 182 (1980) (evidence of mental disease or deficit alone does not completely establish insanity defense); *State v. Potter*, 285 N.C. 238, 249-51, 204 S.E.2d 649, 657 (1974) (evidence of mental illness does not alone establish legal insanity). Accordingly, the State made a proper argument.

Finally, defendant attributes error to the State's argument to the jurors that if they found defendant insane, they should "let him go." According to defendant, combined with the State's prior argument concerning mental illness being an excuse, this argument implied to the jury that defendant would be able to freely move throughout society if the jury found him not guilty by reason of insanity. At the time of this statement, however, after defendant's objection, the trial court told the jury, "I'll instruct you on the consequences at a later time." Indeed, the trial court did later instruct the jury that "a defendant found not guilty by reason of insanity shall immediately be committed to a state mental facility." The trial court further explained to the jury the hearing process defendant would go through and the burden he would have to meet in order to be released. Accordingly, any alleged error was properly handled via the trial court's instruction.

This assignment of error is without merit.

In another assignment of error, defendant argues the State's jury arguments infected the trial with unfairness in that they asked the jury to find defendant guilty for impermissible reasons. Defendant cites six arguments from the State's opening and closing arguments. In many of the instances cited, defendant's appellate counsel appears to have taken minor comments from the State out of context in an attempt to create the illusion of impropriety or prejudice. Nonetheless, we consider each of defendant's arguments in turn.

As a preliminary matter, we note prosecutors have an obligation to be zealous advocates and are thus provided wide latitude in hotly contested cases like the present one. *State v. McCollum*, 334 N.C. 208, 227, 433 S.E.2d 144, 154 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994); *see also State v. Smith*, 352 N.C. 531, 561, 532 S.E.2d 773, 792 (2000), *cert. denied*, 532 U.S. 949, 149 L. Ed. 2d 360

(2001). Moreover, control of arguments is generally left to the trial court's discretion, and reversal is warranted only where the remark in issue is extreme and clearly calculated to prejudice the jury. *Huffstetler*, 312 N.C. at 111, 322 S.E.2d at 122. We now consider each of defendant's arguments.

**[19]** First, the State argued the jury's duty is to enforce the law. The following portion of the State's closing argument appears relevant:

> Now, ladies and gentlemen, we call it jury duty. It's not jury spend a few days off work. It's not jury come up here and have fun. It's jury duty. Because you have a job to do. Your job is not done. Your job is just getting ready to start. You've got to take everything that you heard back there, and you've got to decide what the right thing to do is. You've got to decide whether or not that man is gonna be accountable for his actions on June the first of 1993, to enforce the law.

> Now, it's a common misconception that police officers enforce the law. They don't enforce the law. Police officers are fact gatherers. Police officers take pieces of crime, be they witnesses, victims, evidence, whatever, and they gather them up. D.A's office doesn't enforce the law. D.A's office takes all those pieces that the police officers bring them, investigators bring to them, and they put it together. And we show it to you. Judge doesn't enforce the law.

> [DEFENSE COUNSEL]: Objection.

> [THE STATE]: Judge is the umpire.

> THE COURT: Overruled.

> [THE STATE]: His job is to make sure that that man down there gets a fair trial, and that the State of North Carolina gets a fair trial. So who enforces the law? The answer is obvious. You all enforce the law.

> [DEFENSE COUNSEL]: Objection.

> THE COURT: Overruled.

> [THE STATE]: Without juries composed of citizens from the community, there's no one to enforce the law. All the laws in the books don't mean a thing if nobody enforces the law. All of the evidence collection and forensic evaluation means nothing if there aren't juries to enforce the law. So it's up to you, ladies and

gentlemen. Are you going to enforce the law? Are you going to hold him accountable?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[DEFENSE COUNSEL]: That's a misstatement.

[THE STATE]: Are you going to do your duty? Ladies and gentlemen, are you going to do your duty and rise up as one voice, one voice of the community?

[DEFENSE COUNSEL]: Objection. Improper.

THE COURT: Sustained.

[THE STATE]: And tell that boy—

[DEFENSE COUNSEL]: Objection.

THE COURT: Wait a minute. Sustained as to any community argument.

[THE STATE]: Tell this man—

THE COURT: Wait a minute. Don't consider that, members of the jury.

[THE STATE]: —that he can get away with it?

[DEFENSE COUNSEL]: Objection.

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[THE STATE]: Are you going to tell him that he's unaccountable, and that what he did on June the first of 1993 was wrong? Are you going to do your duty? Are you ready to do your duty? I think you are. You've got what you need.

This Court has held it improper for a prosecutor to " 'suggest that the jury is effectively an arm of the State in the prosecution of the defendant or that the jury is the last link in the State's chain of law enforcement.' " *State v. Lloyd*, 354 N.C. 76, 130, 552 S.E.2d 596, 632 (2001) (quoting *State v. Elliott*, 344 N.C. 242, 285, 475 S.E.2d 202, 222-23 (1996), *cert. denied*, 520 U.S. 1106, 137 S.E.2d 312 (1997)). Prosecutors are allowed to outline the function of the various participants in a trial. Such an argument may properly include statements

concerning the vital importance of jurors to the system of justice and an admonition that the "buck stops here." *See State v. McNeil,* 350 N.C. 657, 687-88, 518 S.E.2d 486, 505 (1999), *cert. denied,* 529 U.S. 1024, 146 L. Ed. 2d 321 (2000).

In the present case, it appears the State used its argument to clear up any jury confusion about the responsibilities of the police, the prosecutors, the judge, and the jury. The State ultimately sought to ensure the jury understood that its proper role included holding defendant accountable. Accordingly, the State's argument remained in line with this Court's precedent.

[20] Second, defendant cites as error the State's opening and closing argument where the State said that if the jury found defendant guilty, it would learn more during sentencing. We hold that the State's argument merely reemphasized what the jury already knew, namely, that if defendant was found guilty, additional evidence would be submitted on the question of defendant's sentence. This procedural issue had been fully explained to the jury during jury selection, and it was not error for the State to refer to this fact during argument.

[21] Third, defendant contends the State's opening argument included a request that the jurors consider the victim as a relative and put themselves in the victim's shoes. The following portion of the State's opening argument appears relevant:

[THE STATE]: You will come to know a little bit more about Cindy through evidence presented by the State. You will come to know that in fact, she had two children. She worked at Wadesboro Manufacturing. She—I believe you will find after listening to all the evidence, will see that she is not very different from all of us. She could very well be a wife of some of you, a daughter to some of you—

[DEFENSE COUNSEL]: Objection.

[THE STATE]: —a sister of some of you.

THE COURT: Sustained.

[THE STATE]: And that like many folks, she had some imperfections. Some of those will be that she had some uncertainties within her own life about her marriage to Michael. That on June first of 1993, she had resolved those uncertainties. She and Michael McIntyre, her husband of 14 years, had decided to pull family back together. She had decided to end the relationship that

she had been involved with the defendant in. Exercising her own free will and her right to choose is what she did, the evidence will tend to show.

Arguments that ask the jurors to place themselves in the victim's shoes are improper. *McCollum*, 334 N.C. at 224, 433 S.E.2d at 152. In the present case, however, it appears the State was simply providing some background on the victim. The State's comment that Cindy could be related to a member of the jury appears to have been an effort to show Cindy was a typical community member. There is no indication the State was urging the jurors to put themselves in Cindy's shoes. As such, the State's argument was proper.

[22] Fourth, defendant argues the State improperly referred, during opening and closing arguments, to the lack of consequences defendant had suffered in the six years since the crimes were committed. Defendant argues such consequences are irrelevant to defendant's guilt. Defendant further argues the State improperly ignored the trial court sustaining defendant's objections to this line of argument.

When the State's opening and closing arguments are read in their totality, it is clear the State was suggesting defendant acted in a planned way and made numerous decisions in the process of the killing. When the State briefly remarked during opening statements about the six-year time period, the trial court immediately admonished the State to stick to the evidence. Moreover, in our review of the State's opening and closing arguments, we find no instance where the State referred to the consequences to defendant as being relevant to the jury's determination of guilt. Accordingly, we hold that the trial court properly handled the portions of argument in issue.

Fifth, defendant argues the State contradicted the evidence and argued facts not in evidence. Defendant cites several examples, and we consider each individually.

[23] Defendant first points to the State's comment that "[t]here wasn't one witness for the defendant that could speak to you and look you in the eye and tell you the person that used this rope and this knot was having a psychotic episode or having some type of out-of-body experience." Here, the State was asserting that no witness could testify as a fact that defendant was having a psychotic episode at the time of the murder. Despite the existence of conflicting expert opinion on the issue, the State was properly pointing out that there was no definitive evidence to prove an episode took place.

**[24]** Defendant also contends the State tried to impeach the insanity defense with the idea that defendant had taken mental tests several times and knew how to manipulate them. According to defendant, there was no evidence of this in the record. Defendant cites the following portion of the State's argument:

> Ladies and gentlemen, I pose this question to you. In those 17 and a half years that he was down there being evaluated by those Georgia doctors, how many times do you think he's taken those tests? The man knows the game.
>
> [DEFENSE COUNSEL]: Objection.
>
> [THE STATE]: He knows how to accomplish what he wants.
>
> . . . .
>
> THE COURT: Overruled.
>
> [THE STATE]: He knows how to portray himself in whatever light helps him out. 17 and a half years of practice makes perfect, ladies and gentlemen.

Considering the broad evidence of defendant's mental problems and the evaluations and treatment he received for these problems, it was proper for the State to argue that defendant had some expertise portraying his psychological makeup in a favorable manner. Further, the trial court instructed the jurors that if their recollection of the evidence differed from that presented by the attorneys in argument, the jurors should disregard what the attorneys said and rely solely on their own independent recollection.

**[25]** Defendant additionally argues there was no support in the record for the State's argument that its own expert, Dr. Robert Rollins, had gathered information from other people in formulating his opinion. It is helpful to consider this argument in context:

> [THE STATE]: . . . Well, Doctor Rollins told you he had other stuff, information gathered by his assistant Mr. Meachum. Evidence from people who were out there.
>
> [DEFENSE COUNSEL]: Objection. Not evidence.
>
> [THE STATE]: Evidence from officers. Evidence from the D.A.'s office.
>
> [DEFENSE COUNSEL]: Objection.

THE COURT: Well, sustained as to people who were out there. Overruled as to the remaining.

[THE STATE]: He didn't just talk to the defendant. He talked to people, contrary to what they assert.

[DEFENSE COUNSEL]: Objection. That's not the testimony.

[THE STATE]: And I'll tell you what, ladies and gentlemen—

THE COURT: Overruled.

[THE STATE]: —you think about it, and you decide what you remember him saying.

After our review, we conclude the State did not proceed with this line of argument after defendant's objection. Rather, the State asked the jury to consider this issue based on its own recollection of testimony from the trial. This is in line with the instruction the trial court properly gave the jurors to base their deliberations on their own memory of testimony rather than the attorneys' arguments.

Accordingly, we find the trial court properly handled the issues raised by defendant. Moreover, the trial court's instructions cured any potential error.

[26] Finally, defendant argues the State improperly urged the jury to contrast the court's fair treatment of defendant to defendant's treatment of the victim. Defendant also contends the State impugned the integrity of defense counsel and defendant's witnesses by asking the jury if it was "fair when the people who came up here and testified sat here and had words put in their mouth by the defense?" According to defendant, this argument was irrelevant and inflammatory and penalized defendant's exercise of his due process right to a fair trial.

The State's remarks concerning the fairness defendant showed the victim are well within the parameters created by this Court. *See McNeil*, 350 N.C. at 688-89, 518 S.E.2d at 505 ("[t]his Court has repeatedly held it is not improper to argue that defendant, as judge, jury, and executioner, single-handedly decided the victim's fate."); *Elliott*, 344 N.C. at 275-76, 475 S.E.2d at 217 (prosecutor's request that jury give victim a fair trial "amounted to nothing more than a request that the State be given equal consideration."). Similarly, the State's remark concerning defense counsel putting words in the mouths of witnesses was proper. The State had a right to respond to defendant's attacking closing argument. *See State v. Trull*, 349 N.C. 428, 453, 509 S.E.2d 178,

194 (1998), *cert. denied*, 528 U.S. 835, 145 L. Ed. 2d 80 (1999). Moreover, the State's argument was not abusive or ongoing. Rather, our review of the record indicates the State's comment was isolated and did not deprive defendant of his right to a fair trial. *See State v. Bowman*, 349 N.C. 459, 473-74, 509 S.E.2d 428, 437 (1998), *cert. denied*, 527 U.S. 1040, 144 L. Ed. 2d 802 (1999).

This assignment of error is overruled.

[27] In another assignment of error, defendant contends the trial court erred in its jury instructions on insanity. The trial court instructed the jury in a manner virtually identical to our state's pattern jury instructions:

> [S]ince sanity and soundness of mind is the natural and normal condition of people, everyone is presumed to be sane until the contrary is made to appear. This means that the defendant has the burden of proof on the issue of insanity. However, unlike the State, which must prove all the other elements of the crime beyond a reasonable doubt, the defendant need only prove his insanity to your satisfaction. That is, the evidence taken as a whole must satisfy you not beyond a reasonable doubt, but simply to your satisfaction that the defendant was insane at the time of the alleged offense.

*See* N.C.P.I.—Crim. 304.10 (1992).

Defendant contends this instruction was ambiguous because a defendant has the burden of proving insanity by a preponderance of the evidence. Because the trial court used the term "prove his insanity to your satisfaction," defendant contends the trial court failed to adequately and clearly instruct the jury on the proper burden of proof.

In *State v. Weeks*, we considered an instruction almost identical to the one given in the present case. 322 N.C. 152, 175, 367 S.E.2d 895, 908-09 (1988). In *Weeks*, we determined the trial court's refusal to define "satisfaction" did not leave unbridled discretion in the jury as to defendant's burden of proof. *Id.* Similarly, in the present case, we hold "the jury was properly instructed on the standard of proof needed by defendant to prove his insanity." *Id.* at 175, 367 S.E.2d at 909.

Moreover, we find no merit in defendant's suggestion that the jury may have been confused by the interchangeable use of the terms

"satisfied," "convinced," and "proof beyond a reasonable doubt." Based on our review of the record, we conclude defendant is attempting to create the appearance of impropriety by stringing together comments from the State and the trial court which occurred at unconnected times during the trial. The trial court fully instructed the jury on which standard to use and specifically told the jury not to use the "beyond a reasonable doubt" standard in considering whether defendant was insane. *See State v. Ward*, 301 N.C. 469, 473-74, 272 S.E.2d 84, 87 (1980). In short, there was no risk that the jury applied an improper standard to its insanity deliberations.

This assignment of error is without merit.

[28] In another assignment of error, defendant argues the trial court committed plain error by failing to intervene *ex mero motu* to prevent the State from commenting on defendant's exercise of his right to remain silent. Defendant cites two comments by the State. First, the State said, "There wasn't one witness for the defendant that could speak to you and look you in the eye and tell you the person that used this rope and this knot was having a psychotic episode or having some type of out-of-body experience." Second, the State said, "[T]here's not been a consequence for that man that sits over there who won't even look you folks in the eye. . . . And hasn't the entire trial."

Criminal defendants have a constitutional right not to testify and it is improper for prosecutors to comment on a defendant's exercise of this right. *State v. Mitchell*, 353 N.C. 309, 326, 543 S.E.2d 830, 840, *cert. denied*, —— U.S. ——, 151 L. Ed. 2d 389 (2001). However, if a prosecutor's comment on a defendant's failure to testify was not extended or was a "slightly veiled, indirect comment on [a] defendant's failure to testify," there was no prejudicial violation of the defendant's rights. *Id.* at 326, 543 S.E.2d at 841; *see also State v. Rouse*, 339 N.C. 59, 96, 451 S.E.2d 543, 563 (1994), *cert. denied*, 516 U.S. 832, 133 L. Ed. 2d 60 (1995). Further, comments on a defendant's courtroom demeanor are not necessarily comments on a defendant's silence. *State v. Barrett*, 343 N.C. 164, 177-78, 469 S.E.2d 888, 895-96, *cert. denied*, 519 U.S. 953, 136 L. Ed. 2d 259 (1996).

In the present case, the State's argument that no witness could testify that defendant was having a psychotic episode was merely a comment on the witnesses who had testified. The State was arguing that no defense witness could testify concerning defendant's mental state at the time of the killing. Because we find no direct reference in

this comment to defendant's silence, we hold the trial court did not err by failing to intervene *ex mero motu*.

Similarly, as to the State's comment on defendant's failure to look into the jurors' eyes, we conclude this was merely a brief reference to defendant's courtroom demeanor. This comment cannot reasonably be read in a manner that implicates the defendant's right not to testify. As such, the trial court did not err in handling this portion of the State's argument.

This assignment of error is without merit.

[29] In another assignment of error, defendant contends the trial court erred by overruling objections and denying his motion to strike testimony by a State's witness informing the jurors about a prejudicial, irrelevant statement that defendant allegedly made. Defendant's argument pertains to the following portion of Joyce Burr's testimony:

Q Mrs. Burr, tell the members of the jury what the defendant told you or told you and your husband the day before Cindy's death.

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

A He said that if he could kill the bitch and get away with it, he would. But he wasn't, because his mother paid too much money to get him out of prison in Georgia.

[DEFENSE COUNSEL]: Move to strike.

THE COURT: Overruled.

Q Now, Mrs. Burr, did he tell you who that—did he tell you who the person was that he was referring to as bitch?

A Cindy.

According to defendant, this testimony was improperly and prejudicially admitted as proof of his other crimes. Additionally, defendant argues the prejudice from the testimony was enhanced when the State later repeated the statement and called attention to it during argument.

Prior to the admission of the testimony in issue, the trial court held a hearing. Defendant objected to the part of the statement revealing that his mother paid money to get him out of prison. The trial court ruled the testimony was relevant and admissible pursuant

to North Carolina Rule of Evidence 403. We conclude this ruling was not an abuse of the trial court's discretion.

Only relevant evidence is admissible. N.C.G.S. § 8C-1, Rule 402 (2001). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (2001). In criminal cases, Rule 401 should be broadly construed so that all evidence which may shed any light on the alleged crime is admitted. *State v. Cagle*, 346 N.C. 497, 506, 488 S.E.2d 535, 542, *cert. denied*, 522 U.S. 1032, 139 L. Ed. 2d 614 (1997). Nonetheless, a trial court should exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." N.C.G.S. § 8C-1, Rule 403 (2001). A trial court's ruling on such an issue will be disturbed on appeal only if the trial court's decision was so arbitrary that it could not have been based on reason. *Cagle*, 346 N.C. at 506-07, 488 S.E.2d at 542.

In analyzing the statement in issue here, we find considerable probative value in both parts of the statement. The first part of the statement, in which defendant said he could kill the victim, showed that defendant had the motivation to kill the victim. It also revealed that defendant had thought about killing the victim for some time before the murder occurred. The second part of the statement, in which defendant said his mother paid to get him out of prison, allowed the jury valuable insight concerning defendant's thinking and evaluation prior to the murder. Hearing both parts of the statement gave the jury the opportunity to see how defendant was deliberating over whether to kill the victim. Because defendant's mental state was an issue at trial, this information was extremely relevant and probative to the jury's deliberations.

We also must consider the danger of unfair prejudice to defendant via the admission of the testimony. The testimony did not reveal why defendant had been in prison or why his mother paid for his release. Further, our review of the record reveals defendant, in questioning his own witnesses as well as in closing arguments, disclosed that he had spent time in prison. Accordingly, we find any prejudice from the admission of the testimony in issue was not significant enough to warrant the testimony's suppression. Moreover, because we hold the testimony was properly admitted, we also hold the State's references to the testimony were proper.

This assignment of error is overruled.

**[30]** In another assignment of error, defendant argues the trial court's instructions unconstitutionally relieved the State of its burden of proving all elements of the kidnapping crimes and the evidence was insufficient to support kidnapping as charged in the indictments.

The indictment for the kidnapping of Matthew McIntyre alleged defendant confined, restrained, or removed Matthew from one place to another "for the purpose of facilitating the commission of a felony, First Degree Murder." The indictment for the kidnapping of Cindy McIntyre alleged defendant confined, restrained, or removed her from one place to another "for the purpose of facilitating the commission of a felony, First Degree Murder, and terrorizing" the victim.

The trial court's instructions on the kidnappings required the State to show *inter alia,* that defendant "confined or restrained or removed [the victims] for the purpose of facilitating [defendant's] commission for murder" of Cindy McIntyre. The jury returned a verdict finding defendant guilty of first-degree kidnapping, but did not specify which purpose or purposes contained in the indictment formed the basis for the verdict.

Defendant argues his constitutional rights were violated because the trial court instructed the jury that it must find the kidnapping was for the purpose of "murder" instead of "first degree murder," as specified in the indictment, and because the trial court failed to instruct the jury that it must find defendant was "terrorizing" Cindy McIntyre as the indictment alleged. N.C.G.S. § 14-39(a) provides that a defendant is guilty of kidnapping if he

shall unlawfully confine, restrain, or remove from one place to another . . . if such confinement, restraint or removal is for the purpose of:

(1) Holding such other person for a ransom or as a hostage or using such other person as a shield; *or*

(2) Facilitating the commission of *any felony* or facilitating flight of any person following the commission of a felony; *or*

(3) Doing serious bodily harm to or terrorizing the person so confined, restrained or removed or any other person; *or*

(4) Holding such other person in involuntary servitude in violation of G.S. 14-43.2.

N.C.G.S. § 14-39(a) (2001) (emphasis added).

This Court has held that language in an indictment following the words "committing a felony" is "mere harmless surplusage and may properly be disregarded in passing upon its validity." *State v. Freeman*, 314 N.C. 432, 435-36, 333 S.E.2d 743, 745-46 (1985). Similarly, we hold the trial court's instructions here were adequate and valid. The omission of "first degree" to modify "murder" was neither error nor prejudicial.

Defendant's contention that the trial court erred in failing to instruct the jury that it must find defendant was terrorizing Cindy McIntyre is also without merit. A kidnapping indictment

> must allege the purpose or purposes upon which the State intends to rely, and the State is restricted at trial to proving the purposes alleged in the indictment. Although the indictment may allege more than one purpose for the kidnapping, the State has to prove only one of the alleged purposes in order to sustain a conviction of kidnapping.

*State v. Moore*, 315 N.C. 738, 743, 340 S.E.2d 401, 404 (1986) (citations omitted). While the indictment for the kidnapping of Cindy McIntyre listed "terrorizing" as one of the purposes, it was not necessary for the trial court to include terrorizing in its instructions. The trial court thus did not err in its instructions.

[31] Defendant further argues the kidnappings were an inherent and integral part of Cindy McIntyre's murder and therefore the conviction for her kidnapping cannot stand. This argument is also without merit. We have held that "a person cannot be convicted of kidnapping when the only evidence of restraint is that 'which is an inherent, inevitable feature' of another felony," but evidence of actions constituting additional restraint can support such a conviction. *State v. Beatty*, 347 N.C. 555, 559, 495 S.E.2d 367, 369 (1998) (quoting *State v. Fulcher*, 294 N.C. 503, 523, 243 S.E.2d 338, 351 (1978)). The additional restraint may consist of actions that increase the victim's helplessness and vulnerability. *See id.* at 559, 495 S.E.2d at 369-70. In the present case, the binding and beating of Cindy McIntyre and the restraint of Matthew McIntyre were not essential actions necessary to restrain Cindy in order to murder her, but were additional actions that increased her

helplessness and vulnerability. Accordingly, defendant's assignment of error is overruled.

[32] In another assignment of error, defendant argues the trial court erred by failing to declare a mistrial when the State introduced evidence that defendant escaped from prison while serving time for a prior murder in Georgia. Defendant also argues it was error for the trial court to fail to declare a mistrial when the State introduced evidence about defendant pulling the trigger in the Georgia murder. However, defendant points to no specific transcript reference and makes no specific argument about this alleged error. We therefore only examine the contention regarding the evidence of the escape. The following exchange took place during the State's cross-examination of defense expert witness Dr. Strahl:

Q . . . [I]n your review of the Georgia Department of Corrections records, were you aware that [defendant] had escaped while he was serving time down there in Georgia?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

Q Were you aware?

A I was not aware, no.

Q That wouldn't change your opinion, would it?

A In terms of dangerousness to others?

Q In terms of adjusting well to prison life, being a good inmate.

[DEFENSE COUNSEL]: Objection.

THE COURT: Now, is this contained in the records that were introduced?

[THE STATE]: Weren't introduced, Your Honor. I'm asking if he's aware of it.

[DEFENSE COUNSEL]: No, sir.

THE COURT: Well, sustained. Don't consider the question, members of the jury, about any prior escape. Can all of you disregard that?

(Jurors nod their head[s] affirmatively.)

The decision to grant a motion for a mistrial is within the discretion of the trial court. *State v. McCarver*, 341 N.C. 364, 383, 462 S.E.2d

25, 36 (1995), *cert. denied*, 517 U.S. 1110, 134 L. Ed. 2d 482 (1996). A mistrial should be declared only if there are serious improprieties making it impossible to reach a fair, impartial verdict. *Id.* at 383, 462 S.E.2d at 35-36. "Jurors are presumed to follow a trial court's instructions." *Id.* at 384, 462 S.E.2d at 36.

Here, the trial court sustained defendant's objection and instructed the jury to disregard the reference to the escape. Because we assume the jury followed this instruction and defendant seemed satisfied at the time with the instruction and did not request a mistrial, the trial court did not err by failing to declare a mistrial *ex mero motu*. Accordingly, this assignment of error is overruled.

[33] In another assignment of error, defendant argues the trial court erred by incorrectly instructing the jury not to consider defendant's special issue of legal insanity unless the jury first found defendant was not guilty. Consistent with our state's pattern jury instructions, the trial court instructed the jury as follows:

> Now, if you find the defendant not guilty for any reason, you will return a verdict of not guilty, and will so indicate on each of the forms. But you will not—and you will only answer the special issue that I just read to you if you return a verdict of not guilty. Now, if you return a verdict of not guilty, you must answer the special issue which asks whether you found the defendant not guilty because you were satisfied that he was insane. If you found the defendant not guilty because you were satisfied that he was insane, answer yes. If you were not so satisfied, answer no.

*See* N.C.P.I.—Crim. 304.10 (1992). Defendant argues this instruction was reasonably likely to mislead the jury to believe that before it could consider defendant's special issue of legal insanity, the jury was required to find defendant not guilty.

Defendant's argument is without merit. Prior to the above referenced instruction, the trial court had instructed the jury that

> when there's evidence which tends to show that the defendant was legally insane at the time of the alleged offense, you will consider this evidence only if you find that the State has proved beyond a reasonable doubt each of the things about which I've instructed you. Even if the State does prove each of these things beyond a reasonable doubt, the defendant would nevertheless be not guilty if he was legally insane at the time of the alleged offense.

*See* N.C.P.I.—Crim. 304.10 (1992). The trial court fully instructed the jury that it was to consider the insanity defense only if it found the State had proved its case beyond a reasonable doubt. Taken in context with the trial court's instructions on the insanity defense, there was no error.

This assignment of error is without merit.

## SENTENCING PROCEEDING

[34] In another assignment of error, defendant argues the trial court erred by allowing the State to arbitrarily decline to present evidence of the aggravating circumstance that defendant had previously been convicted of another capital offense which is the statutory aggravating circumstance set out in N.C.G.S. § 15A-2000(e)(2), which refers in pertinent part to an aggravating circumstance where "[t]he defendant had been previously convicted of another capital felony." N.C.G.S. § 15A-2000(e)(2) (2001).

N.C.G.S. § 15A-2000(e)(3) refers in pertinent part to an aggravating circumstance in which "[t]he defendant had been previously convicted of a felony involving the use or threat of violence to the person."

Defendant was found guilty of murder in 1974 in Georgia. In the present case, the State did not pursue a prior capital felony aggravating circumstance under N.C.G.S. § 15A-2000(e)(2) but instead proceeded as though the offense was a prior violent felony under N.C.G.S. § 15A-2000(e)(3). The prosecutor said, "We've been thinking of doing this since last spring just as a way of simplifying [issues regarding the constitutionality of the Georgia statute under which defendant was sentenced]."

Defendant relies on this Court's decision in *State v. Case* where we held that if an aggravating circumstance could be supported by the evidence, the State must submit it. 330 N.C. 161, 163, 410 S.E.2d 57, 58 (1991). In *Case*, this Court held:

> It was error for the State to agree not to submit aggravating circumstances which could be supported by the evidence. . . . If our law permitted the district attorney to exercise discretion as to when an aggravating circumstance supported by the evidence would or would not be submitted, our death penalty scheme would be arbitrary and, therefore, unconstitutional. Where there

is no evidence of an aggravating circumstance, the prosecutor may so announce, but this announcement must be based upon a genuine lack of evidence of any aggravating circumstance.

*Id.* at 163, 410 S.E.2d at 58.

The facts of the present case are clearly distinguishable from *Case.* Here, the State requested a statutory aggravating circumstance based on the evidence of the prior murder in Georgia. The (e)(3) circumstance was requested and submitted in lieu of the (e)(2) circumstance. The integrity of the capital sentencing scheme, which was at issue in *Case,* is not at issue here. Whether it was styled as a capital felony or as a violent felony, the fact that defendant had been convicted previously of murder was submitted to the jury for its consideration. Defendant's assignment of error is without merit.

[35] In another assignment of error, defendant argues the trial court erred by instructing the jury about a sentencing option not authorized by statute. In June 1993, when defendant committed the murder, the maximum sentence for first-degree murder was either death or life imprisonment with the possibility of parole. N.C.G.S. § 15A-1371(a1) (Cum. Supp. 1993) (amended 1993, effective 1995). The trial court instructed the jury only that if it found defendant guilty of first-degree murder, it would have to choose between life imprisonment without parole and the death penalty. Defendant did not object to and in fact invited the trial court's error by requesting the instruction on life imprisonment without parole. Further, defendant repeatedly urged the jury to recommend a sentence of life imprisonment without parole. Defendant now argues the jury may have been influenced to decide that life imprisonment without parole would be a worse punishment than death because the jury heard defendant was mentally disturbed, suicidal, masochistic, unhappy and was living a tortured life in prison.

"[T]his Court has consistently denied appellate review to defendants who have attempted to assign error to the granting of their own requests." *State v. Wilkinson,* 344 N.C. 198, 213, 474 S.E.2d 375, 383 (1996). A defendant cannot complain about a jury instruction that he specifically requests. *Id.; State v. McPhail,* 329 N.C. 636, 643, 406 S.E.2d 591, 596 (1991).

Defendant specifically requested and was granted an instruction on life imprisonment without parole. This was invited error, and thus defendant's argument is misplaced.

Further, the prohibition against *ex post facto* laws was not violated as defendant claims. Here, defendant was sentenced to the maximum punishment of death, which was provided by law at the time of the murder. Accordingly, defendant has no *ex post facto* claim. This assignment of error is overruled.

**[36]** In another assignment of error, defendant argues the trial court erred by failing to specify and define the alleged crime of violence in the statutory aggravating circumstance submitted pursuant to N.C.G.S. § 15A-2000(e)(11). Defendant argues this makes the aggravating circumstance vague and overbroad in violation of the Eighth Amendment. Further, because the trial court did not instruct the jury on which crime constituted the course of conduct, defendant now argues it is possible that the jury relied on kidnapping to find the (e)(11) circumstance.

During the jury charge, the trial court instructed the jury as follows:

> And finally, number four, was this murder part of a course of conduct in which the defendant engaged, and did that course of conduct include the commission by the defendant of other crimes of violence against another person. Now, a murder is part of such a course of conduct if you find from the evidence beyond a reasonable doubt that in addition to killing the victim, the defendant, on or about the alleged date, was engaged in a course of conduct which involved the commission of another crime of violence against another person, and that this other crime was included in the same course of conduct in which the killing of the victim was also a part, you would find this aggravating circumstance and would so indicate by having your foreperson write yes in the space provided. If you do not so find or have a reasonable doubt as to one or more of these things, you will not find this aggravating circumstance, and will so indicate by having your foreperson write no in that space.

*See* N.C.P.I.—Crim. 150.10 (1993).

At the charge conference, during the discussion of the (e)(11) aggravating circumstance, the following exchange took place:

> THE COURT: Was this murder part of the course of conduct in which the defendant engaged, and did that course of conduct include the commission by the defendant of a crime of violence

against another person. Or would you rather it read "other crimes of violence."

[THE STATE]: Other crimes of violence, Your Honor.

THE COURT: Okay.

[DEFENSE COUNSEL]: Note our objection to that and point out that [defendant has] already been convicted of kidnapping, and that's the only other crime against the other persons, kidnapping of Matthew and kidnapping of Cynthia. And I think that's allowing the use of double of—you know, twice, using it twice.

THE COURT: Okay. Well, assault. He assaulted him with a firearm, though, so, and that's for the jury to say and determine, I think. I think the evidence supports it.

Defendant argues that the trial court promised to submit a theory of assault to constitute the other violent crime in the course of conduct. Because the trial court did not submit such a theory, defendant argues the error is preserved for this Court's review on the merits.

After reviewing the transcript, we conclude the trial court never promised to specify a crime to constitute the course of conduct. Further, defendant did not object to the trial court's jury instruction. We therefore review this issue under a plain error standard, under which reversal is justified when the claimed error is so basic, prejudicial, and lacking in its elements that justice was not done. *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983).

We have held that the term "course of conduct" is not "unconstitutionally vague or without definition." *State v. Williams*, 305 N.C. 656, 685, 292 S.E.2d 243, 260-61, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982). The trial court here used an instruction that was virtually identical to a pattern jury instruction. N.C.P.I. Crim.—150.10 (1993).

The trial court's instruction on the (e)(11) aggravating circumstance was sufficient. Defendant gives no authority showing the trial court must specify the crime or crimes to support the (e)(11) aggravating circumstance, and this Court has approved the type of instruction used by the trial court here.

Further, there was no possibility here of double-counting. The trial court instructed the jury it could find the (e)(5) aggravating circumstance that defendant committed the murder while engaged

in the commission of kidnapping if it found that while killing the victim,

> the defendant was confining or restraining or removing Cindy McIntyre from one person—place to another without her consent, and that this was for the purpose of facilitating his commission of murder, or for the purpose of terrorizing her, and that this confinement or restraint or removal was a separate complete act, independent of and apart from the murder . . . .

Later, the trial court instructed the jury that it could find the (e)(11) aggravating circumstance if it found defendant was in a course of conduct involving another crime of violence against another person. Thus, the (e)(5) aggravating circumstance was limited to the kidnapping of the victim while the (e)(11) aggravating circumstance was limited to the kidnapping and assault of the victim's son. Accordingly, defendant's assignment of error is overruled.

[37] In another assignment of error, defendant argues the trial court erred by incorrectly instructing the jury that a single crime of violence could support the (e)(11) aggravating circumstance. Defendant argues that the (e)(11) language demonstrates clear legislative intent to limit the aggravating circumstance to cases where the jury finds there is no reasonable doubt that the defendant committed multiple crimes of violence during the course of conduct.

As discussed above, the trial court instructed the jury on the (e)(11) aggravating circumstance in a manner virtually identical to our state's pattern jury instructions. *See* N.C.P.I.—Crim. 150.10 (1993). The following portion of the instruction appears relevant:

> Now, a murder is part of such a course of conduct if you find from the evidence beyond a reasonable doubt that in addition to killing the victim, the defendant, on or about the alleged date, was engaged in a course of conduct which involved the commission of another crime of violence against another person, and that this other crime was included in the same course of conduct in which the killing of the victim was also a part, you would find this aggravating circumstance and would so indicate by having your foreperson write yes in the space provided.

Defendant's argument is without merit. This Court has approved of this instruction in other cases. *State v. Garner*, 340 N.C. 573, 594-95, 459 S.E.2d 718, 729-30 (1995), *cert. denied*, 516 U.S. 1129, 133 L. Ed. 2d 872 (1996); *State v. Hill*, 331 N.C. 387, 418-19, 417 S.E.2d

765, 780-81 (1992), *cert. denied*, 507 U.S. 924, 122 L. Ed. 2d 684 (1993). In *Hill*, the trial court instructed the jury as follows:

> If you find from the evidence beyond a reasonable doubt that, in addition to killing the victim, the defendant on or about the alleged date was engaged in a course of conduct which involved the commission of another *crime* of violence against another *person* and that these other crimes [sic] were included in the same course of conduct in which the killing of the victim was also a part, you would find this aggravating circumstance.

*Hill*, 331 N.C. at 418, 417 S.E.2d at 781 (emphasis added).

The instruction given by the trial court in *Hill* was substantially the same as that given in the present case. In *Hill*, this Court explicitly approved of the trial court's instruction, holding that "the terms 'crime' and 'person' in their singular forms in the challenged instruction . . . tended, in light of the evidence in the present case, to indicate that the jury could . . . consider only the defendant's attempt to kill Mrs. Hill [a victim other than the victim of the murder for which the defendant was being tried] on 10 January 1990 and not other events." *Id.* at 418-19, 417 S.E.2d at 781. A trial court may properly instruct the jury on (e)(11) by limiting the jury's consideration to the conduct involved in one other crime. *Id.* at 419, 417 S.E.2d at 781.

Further, we have held that evidence of one other crime is sufficient to submit the (e)(11) aggravating circumstance. *State v. Rogers*, 316 N.C. 203, 234, 341 S.E.2d 713, 731 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988). In *Rogers*, there was evidence that after killing one victim, the defendant fired his weapon at another man intending to kill him. *Id.* This Court held that "[t]he jury, by returning guilty verdicts, found beyond a reasonable doubt that [the defendant murdered one man and assaulted another man and] that the trial court properly submitted this [(e)(11)] aggravating circumstance to the jury for its consideration." *Id.*

In the present case, there was substantial evidence that defendant committed two violent crimes against Matthew McIntyre. While accosting Cindy McIntyre, defendant assaulted Matthew McIntyre by pointing a gun at his head and kidnapped Matthew by forcing him into a small bathroom and locking the door so he could not get out. The jury may have used either or both of these crimes against

Matthew to support the (e)(11) aggravating circumstance. This assignment of error is overruled.

[38] In another assignment of error, defendant argues that the trial court erred by submitting the aggravating circumstance that the murder was especially heinous, atrocious, or cruel pursuant to N.C.G.S. § 15A-2000(e)(9) without sufficient evidence in the record. At the charge conference, defense counsel argued the case did not involve prolonged physical or psychological torture, but the trial court disagreed. In deciding whether to submit the (e)(9) aggravating circumstance, "the evidence must be considered in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom." *State v. Hamlet*, 312 N.C. 162, 175, 321 S.E.2d 837, 846 (1984). To find this aggravating circumstance, the murder must be *especially* heinous, atrocious, or cruel. *State v. Stanley*, 310 N.C. 332, 336-37, 312 S.E.2d 393, 396 (1984). The (e)(9) aggravating circumstance can be submitted when the killing is agonizing or dehumanizing to the victim; when the killing is conscienceless, pitiless, or unnecessarily torturous to the victim; or when the murder shows the defendant's mind was unusually depraved, beyond the depravity normally present in first-degree murder. *Gibbs*, 335 N.C. at 61-62, 436 S.E.2d at 356.

We hold that the evidence in this case justified the submission of the (e)(9) aggravating circumstance. The jury could have found this murder to be particularly heinous, atrocious, and cruel because much evidence showed the murder was pitiless and unnecessarily tortuous and that it dehumanized the victim. Defendant attacked the victim in the presence of the victim's ten-year-old son. Defendant then psychologically tortured the victim by threatening her son and locking him in a bathroom. The victim did not know if defendant would kill her son as well. Defendant bound the victim's hands with rope and tape, forced her into a car, pulled her from the car, struck her multiple times, and slammed her head into the car. She screamed for help and begged for her life, but defendant shot her as she tried to run away. In light of this overwhelming evidence, we hold that the (e)(9) aggravating circumstance was properly submitted to the jury.

This assignment of error is overruled.

[39] In another assignment of error, defendant argues the trial court erred by not granting defendant's motion to strike the death penalty. Defendant argues that North Carolina's capital punishment scheme fails to allow for discretion to choose not to seek the

death penalty and is thus unconstitutional. Defendant's argument is without merit.

A capital punishment system must allow for the exercise of discretion. *McCleskey v. Kemp*, 481 U.S. 279, 311-12, 95 L. Ed. 2d 262, 291 (1987); *Woodson v. North Carolina*, 428 U.S. 280, 300-04, 49 L. Ed. 2d 944, 958-61 (1976). This Court has held the required discretion is satisfied by the guided discretion given to juries who sentence defendants in capital cases in North Carolina:

> While it is true that the present statute empowers the jury in effect to impose sentence upon the defendant, that decision is not made blindly. No defendant may be sentenced to death unless and until the jury finds at least one statutory aggravating circumstance to exist beyond a reasonable doubt which outweighs any mitigating circumstance in a sufficiently substantial manner so as to call for the death penalty. No aggravating circumstance which is not provided by the language of the statute may be considered by the jury in imposing sentence.

*Barfield*, 298 N.C. at 351-52, 259 S.E.2d at 542.

Further, this Court has repeatedly held that our capital punishment system is constitutional despite the prosecutor's possession of broad discretion. *See State v. Ward*, 354 N.C. 231, 245, 555 S.E.2d 251, 261 (2001).

The trial court did not err by denying defendant's motion to eliminate the death penalty.

Defendant's assignment of error is overruled.

**[40]** In another assignment of error, defendant argues that the trial court erred by overruling defendant's objections to the State's sentencing arguments.

During closing argument, the State emphasized that defendant had been previously convicted for the Georgia murder and that the only way to ensure defendant would not murder again was to return a death verdict:

> [THE STATE]: One murder is enough. One murder is way too many. Two is unconscionable. You also heard at sentencing, this was the watch that came off of James Rouse and off of that man's buddy. You also saw and held this picture. And there he stands posing just like a proud peacock posing in front of James Rouse's

car, holding this like he's proud of himself. Like he's proud of himself, folks. Hold him accountable.

And what did he do down there in Georgia? That's what's left of James Rouse when the defendant over there is through robbing—robbing and killing him. You saw these pictures. Because you know that in Georgia, March 1974, that man over there, with this right here, put it to the base of his skull.

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[THE STATE]: Right like that, right like that, mashing into the base of his skull just like I've got it, pulled the trigger, and did that. That's the prior violent felony that we're asking you all to consider.

Defendant argues that there was no evidence defendant personally wielded the shotgun in the prior murder or shot victim Rouse, and that instead the evidence showed defendant's codefendant wielded the gun at the time of their capture and arrest.

Evidence at the penalty phase of the trial revealed the following about the prior murder: On 7 March 1974, deputies from the Anson County Sheriff's Office pursued defendant and another man in a small blue station wagon; the passenger fired at the officers with a .22-caliber handgun and a twelve-gauge long-barrel shotgun; during the chase, the passenger threw a twelve-gauge sawed-off shotgun out the window; after apprehending defendant and the passenger, officers found a Polaroid photograph in the station wagon which showed defendant standing in front of the car holding a handgun and the sawed-off shotgun; the body of James Rouse was found in Georgia in March 1974 and Rouse had suffered a close contact wound at the base of his neck; the car defendant was driving when arrested and which was also depicted in the Polaroid photograph was the victim's car; and a shotgun shell found inside the car was fired from the sawed-off shotgun.

This Court has held that arguments are within the control and discretion of the trial court. *State v. Fullwood*, 343 N.C. 725, 740, 472 S.E.2d 883, 891 (1996), *cert. denied*, 520 U.S. 1122, 137 L. Ed. 2d 339 (1997).

Counsel is permitted to argue the facts which have been presented, as well as reasonable inferences which can be drawn

therefrom. Conversely, counsel is prohibited from arguing facts which are not supported by the evidence. These principles apply not only to ordinary jury arguments, but also to arguments made at the close of the sentencing phase in capital cases.

*Id.*

In the present case, the evidence showing defendant posing in front of the Georgia murder victim's car and holding the weapon used to kill that victim permits a reasonable inference that defendant was the shooter.

Defendant argues other statements by the prosecution heightened the prejudice of referring to the prior murder. We conclude simply that defendant was convicted of the Georgia murder, and the State had every right to refer to it during closing argument.

**[41]** Defendant further argues that his rights were violated when the trial court allowed the State to argue that the jurors were a prosecutorial arm of the government as follows:

[THE STATE]: You, ladies and gentleman, 13 most important people in this courthouse. You are the 13 most important people in this county. Today, you are the law. You are justice. From Richfield to Albemarle, from Oakboro to Badin, you 13 people are the law in this county.

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[THE STATE]: Now, the question is, what are you going to tell that man sitting down there when you go back there to deliberate? What are you going to tell him? Are you going to tell him, it's alright, forget about that stuff in Georgia, forget about the nature of this killing, send him off to prison? Or are you going to say, fooled me once, shame on you, fooled me twice, shame on me.

Ladies and gentlemen, the only thing, the only thing it takes for evil to triumph, is for good people to do nothing. Today is your day to do something. Today is your day to be justice.

In examining a similar closing argument in *State v. Brown*, 320 N.C. 179, 203, 358 S.E.2d 1, 18, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987), this Court held such an argument was proper. In *Brown*, the prosecutor argued

You know something, Ladies and Gentlemen of the Jury, today you are the somebody that everybody talks about, and justice is in your lap. The officers can't do any more. The State can't do any more. You speak for all the people of the State of North Carolina as to this bloody murder in the first degree.

*Id.* There, we held that argument did

no more than remind the jurors that "the buck stops here" and that for purposes of defendant's trial, they are the voice and conscience of the community. Nor is there any improper suggestion that the jury is the last link in the State's chain of law enforcement. The jury is merely admonished of its general responsibility impartially to assimilate the evidence of aggravating and mitigating circumstances, to weigh them, and to recommend defendant's sentence accordingly.

*Id.* at 204, 358 S.E.2d at 18 (citations omitted). Here, as in *Brown,* the State merely told the jury that it was the voice and conscience of the community for purposes of defendant's trial. This argument was proper.

**[42]** Defendant additionally argues that it was error for the trial court to overrule an objection to the following argument:

[THE STATE]: He's not here from some fluke of circumstance, ladies and gentlemen. He's not here because of some external powers being exerted on him. He's here because of the choices he's made throughout the course of his life that lead him right here. And ladies and gentlemen, when they stand up here and they talk to you about the State and its thirst for vengeance, about how we're looking for revenge, I want you to remember one thing: That that man signed his own death warrant—

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[THE STATE]: —on June the first of 1993. And he signed it in the blood of Cindy McIntyre. He's not here because of you. He's not here because of us. He's here because of him. And you remember that. Because of the choices that he has made, two people are no longer with us. The choices he has made throughout his life. And now he faces the consequences.

In *State v. Artis*, the State made a similar argument that this Court analyzed and found to be proper. 325 N.C. 278, 328-29, 384 S.E.2d 470, 499 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990). There the State argued:

> Today is judgment day. Who wrote that judgment, Ladies and Gentlemen of the Jury? Are you going to write it? You don't write anything. This man sitting right here wrote his own judgment in this case.
>
> . . . .
>
> He wrote his own judgment in this case when he broke the law, when he killed and murdered [the victim]. He passed judgment on himself. He wrote his own death warrant, which is now for you to sign and, therefore, make it lawful.

*Id.* at 328, 384 S.E.2d at 499. As in *Artis*, the State's argument here simply emphasizes that defendant chose to take another's life. Because nothing in the argument relieves the jury of its responsibility of fairness and impartiality, the trial court did not err by permitting this argument.

**[43]** Further, defendant argues his rights were violated by various portions of the state's closing arguments. Although the majority of defendant's concerns relate to the sentencing proceeding, defendant also refers to some arguments from the guilt-innocence phase which we will address here.

During the guilt-innocence phase of the trial, the State argued the jury should find defendant guilty in order to do justice for the victim and her family and to do justice for the family of the victim of the Georgia murder. The State argued as follows:

> [THE STATE]: . . . This kind of case, the loss is unique. It's permanent. It's devastating for these folks here.
>
> [DEFENSE COUNSEL]: Objection.
>
> [THE STATE]: It's devastating, of course—
>
> THE COURT: Overruled.
>
> [THE STATE]: —for Cindy McIntyre. There is not gonna be a spot on your jury verdict that says, "We, the members of the jury, wish that we could give Cindy McIntyre back her life."

STATE v. PREVATTE

[356 N.C. 178 (2002)]

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[THE STATE]: There's not going to be a spot on this verdict sheet for that. Although as much as you wish there could be, there isn't one. After the defendant, after this human wrecking ball had careened through the lives of Cindy McIntyre and her family and done that damage, what is the testimony about what he did? Folks, he just got in his car and spun away.

The State further argued that the case was

about the horror, pain, consequence that these good people have felt every day of their lives—

[DEFENSE COUNSEL]: Objection.

[THE STATE]: —since June first of 1993.

THE COURT: Overruled.

[THE STATE]: It's a pain that's not going away. You can't bring [the victim] back. But there is something you can do. You can give these people, and you can give Cindy McIntrye's memory some closure.

[DEFENSE COUNSEL]: Objection. Improper.

[THE STATE]: You can end this.

THE COURT: Well, sustained as to the family.

[THE STATE]: You can do the right thing here. And you will do the right thing here. Ask you to find the defendant guilty of first degree murder, and nothing less, based on both premeditation and deliberation.

Defendant also objects to the State's admonishment during sentencing closing argument of "don't you forget what this case is about . . . . It's not about him. It's about her. And don't forget it." The State further argued:

When you deliberate this issue, this fourth and final issue, and you're trying to find out for yourselves whether or not the aggravating circumstances are sufficiently substantial, I'd ask you to consider these things: First of all, would the family of James Rouse say that this was sufficiently substantial?

[DEFENSE COUNSEL]: Objection.

[THE STATE]: Would the family of Cindy McIntyre—

THE COURT: Well, sustained.

[DEFENSE COUNSEL]: Objection.

THE COURT: Sustained as to the family of Rouse. Don't consider that ladies and gentlemen.

[THE STATE]: It will be up to you to decide, ladies and gentlemen of the jury, what is sufficiently substantial . . . . [Y]ou can do justice not only for yourselves, but for Cindy McIntyre.

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[THE STATE]: You can do justice for James Rouse.

[DEFENSE COUNSEL]: Objection.

THE COURT: Well, sustained as to James Rouse, members of the jury.

[THE STATE]: You can do justice for the defendant. Because your answer should be death.

Defendant also argues that the following comments made by the State during the sentencing argument were improper:

Ladies and gentleman, Cindy is gone through the actions of that man. Cindy McIntyre is gone. But her spirit is here.

[DEFENSE COUNSEL]: Objection.

[THE STATE]: And it's been here throughout this whole trial.

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[THE STATE]: Ladies and gentlemen, you saw it. You saw it in the courage of that boy right there when he took the witness stand, told you the best that he could remember about his momma's last moments. You saw her spirit when Cindy's momma took the stand and told you about her trying to put her family back together. She's been here, Cindy. And you've heard her. She's speaking to you now.

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[THE STATE]: She speaks to you, ladies and gentlemen, as clear as that church bell rings down there on a crisp February morning. And what is she saying? She's saying, do the right thing. Do justice. Do it for her.

A prosecutor may properly argue that the victim's death represents a unique loss to the victim's family. *Payne v. Tennessee*, 501 U.S. 808, 825-27, 115 L. Ed. 2d 720, 735-36 (1991); *State v. Gregory*, 340 N.C. 365, 426-27, 459 S.E.2d 638, 673-74 (1995), *cert. denied*, 517 U.S. 1108, 134 L. Ed. 2d 478 (1996). Further, a prosecutor may argue the jury should do justice for the victim and the victim's family if the argument does not specifically relate to the family's opinions about the defendant or the crime. *State v. Laws*, 325 N.C. 81, 105-06, 381 S.E.2d 609, 623 (1989), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990).

In the present case, the State merely argued that the family suffered a unique loss and urged the jury to do justice. The reference to the victim's spirit being at the trial was nothing more than a reference to remaining family members and their need for justice. Defendant's argument is without merit.

**[44]** Defendant also argues his rights were violated because the State asked the jury to penalize defendant for presenting mitigating circumstances. While arguing to the jury that defendant must be held accountable for his actions, the State argued:

There's going to be evidence—arguments about mitigating circumstances. Well, when you go back there, when you go into this room and begin to deliberate the fate of the defendant, ask yourselves well, was the defendant's alcohol abusive father in the yard of Cindy McIntyre cheering him on?

[DEFENSE COUNSEL]: Objection.

[THE STATE]: Go, Ted, go.

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

The State later argued defendant had to face the consequences for his actions:

STATE v. PREVATTE

[356 N.C. 178 (2002)]

Because of the choices that he has made, two people are no longer with us. The choices he has made throughout his life. And now he faces the consequences. And even today, after 20 years of killing, robbing, kidnapping, shooting and mayhem, he tries to escape his fate by presenting you—

[DEFENSE COUNSEL]: Objection.

[THE STATE]: —with mitigating circumstances.

THE COURT: Overruled.

This Court has held that "[p]rosecutors may legitimately attempt to belittle or deprecate the significance of a mitigating circumstance." *State v. Billings*, 348 N.C. 169, 186-87, 500 S.E.2d 423, 433-34 (holding a prosecutor's argument urging the jury to reject mitigating circumstances because many people have the same problems was proper), *cert. denied*, 525 U.S. 1005, 142 L. Ed. 2d 431 (1998); *State v. Larry*, 345 N.C. 497, 528-29, 481 S.E.2d 907, 925 (holding a prosecutor's comment that a mitigating circumstance was an "excuse" for the defendant's crime was proper), *cert. denied*, 522 U.S. 917, 139 L. Ed. 2d 234 (1997); *see also State v. Heatwole*, 344 N.C. 1, 21, 473 S.E.2d 310, 320 (1996) (holding the following statement by a prosecutor to the jury was proper: "You may find the defendant suffers from a serious mental illness. So what."), *cert. denied*, 520 U.S. 1122, 137 L. Ed. 2d 339 (1997).

The State in this case properly belittled the mitigating circumstances submitted by defendant. The State argued that the circumstances should not be an excuse for defendant to avoid the consequences of his actions. It was not error to permit these arguments.

Defendant's assignment of error is overruled.

[45] In another assignment of error, defendant argues the trial court erred when it reinstructed the jury on the definition of a mitigating circumstance. In its original instructions on mitigating circumstances, the trial court's instructions mirrored the North Carolina Pattern Jury Instructions:

Issue two is, do you find from the evidence the existence of one or more of the following mitigating circumstances. Now, 25 possible mitigating circumstances are listed on the form. And you should consider each of them before answering issue two. Now, a mitigating circumstance is a fact or a group of facts which do not constitute a justification or excuse for a killing, or reduce it

to a lesser degree of crime than first degree murder, but which may be considered as extenuating or reducing the moral culpability of the killing, or making it less deserving of extreme punishment than other first degree murders.

Now, our law identifies several possible mitigating circumstances. However, in considering issue two, it would be your duty to consider as a mitigating circumstance any aspect of the defendant's character or record, and any of the circumstances of this murder that the defendant contends is a basis for a sentence less than death, and any other circumstances arising from the evidence which you deem to have mitigating value.

*See* N.C.P.I.—Crim. 150.10 (1993).

During sentencing deliberations, the jury asked, "The term to have a mitigating value, we're a little bit unsure of exactly what that term means." The trial court reinstructed the jury as follows:

A mitigating circumstance is a fact or group of facts which do not constitute a justification or excuse for a killing or reduce it to a lesser degree of crime than first degree murder, but which may be considered as extenuating or reducing the moral culpability of the killing, or making it less deserving of extreme punishment than other first degree murders.

This instruction was virtually identical to the instruction provided in our state's pattern jury instructions. *See* N.C.P.I.—Crim. 150.10 (1993).

Defendant argues this reinstruction was error because the jurors were concerned about how much value they could give particular statutory or nonstatutory mitigating circumstances, and the trial court should have told the jurors "that they could give the facts presented to them whatever mitigating value or weight they wanted and that statutory mitigating circumstances must be given *some* value."

In *State v. Jaynes*, the trial court instructed the jury about mitigating circumstances by saying that

A number of mitigating circumstances listed on the form have been submitted to the jury for its consideration; the same being (1) through and including (37). Now as to these listed circumstances, it is for you to determine from the circumstances and the facts in this case whether or not *any listed circumstance*

has mitigating effect. And if one or more of you should determine by a preponderance of the evidence that the mitigating circumstance listed exists and that it has mitigating value, then you would find that it existed and answer so. If none of you finds that, then you would indicate, no, as to that.

342 N.C. 249, 285, 464 S.E.2d 448, 470 (1995) (alteration in original), *cert. denied,* 518 U.S. 1024, 135 L. Ed. 2d 1080 (1996). The trial court in *Jaynes* further instructed the jurors that they must determine whether or not the listed circumstance had mitigating effect. *Id.* This Court held the trial court erred because it "told jurors that they could elect to give no weight to statutory mitigating circumstances they found to exist." *Id.* at 286, 464 S.E.2d at 470.

In *State v. Davis,* 349 N.C. 1, 506 S.E.2d 455 (1998), *cert. denied,* 526 U.S. 1161, 144 L. Ed. 2d 219 (1999), a case where the jury instructions were similar to those given in the case before us, this Court held that the trial court's instructions on mitigating circumstances were unlike those given in *Jaynes* and were proper. *Id.* at 54-55, 506 S.E.2d at 484-85. We held that

the trial court properly informed the jurors that in order to find a statutory mitigating circumstance to exist, all they must find is that the circumstance is supported by a preponderance of the evidence. However, unlike statutory mitigating circumstances, the trial court instructed the jurors that in order to find nonstatutory mitigating circumstances, they must (1) find by a preponderance of the evidence that the circumstance existed, *and* (2) find that the circumstance has mitigating value. These instructions properly distinguished between statutory and nonstatutory mitigating circumstances and informed the jurors of their duty under the law.

*Id.* at 56, 506 S.E.2d at 485.

In the present case, the trial court followed the North Carolina Pattern Jury Instructions and instructed the jury about each statutory and nonstatutory mitigating circumstance. The trial court made it clear that statutory and nonstatutory mitigating circumstances were different. When referring to the statutory mitigating circumstances, the trial court instructed the jury:

If one or more of you finds by a preponderance of the evidence that this circumstance exists, you would so indicate by having your foreperson write yes in the space provided after this

mitigating circumstance on the form. If none of you find this circumstance to exist, you would so indicate by having your foreperson write no in that space.

*See* N.C.P.I.—Crim. 150.10 (1993).

When referring to the nonstatutory mitigating circumstances, the trial court instructed the jury:

If one or more of you finds by a preponderance of the evidence that this circumstance exists, and also is deemed mitigating, you would so indicate by having your foreperson write yes in the space provided after this mitigating circumstance on the form. If none of you find the circumstance to exist, or if none of you deem it to have mitigating value, you would so indicate by having your foreperson write no in that space.

*See* N.C.P.I.—Crim. 150.10 (1993).

Additionally, the punishment recommendation form clearly differentiated between findings necessary for the jury to find statutory and nonstatutory mitigating circumstances. For each statutory mitigating circumstance, next to the blank in which the jury foreperson was to write "yes" or "no," the instructions specified "one or more of us finds this mitigating circumstance to exist." For each of the nonstatutory mitigating circumstances, next to the blank in which the jury foreperson was to write "yes" or "no," the instructions specified "one or more of us finds this circumstance to exist and deem it to have mitigating value."

After a review of the record, we hold that the trial court's instructions here were not like those given in *Jaynes*. The trial court here never indicated to the jurors that they could give no weight to statutory mitigating circumstances they found to exist. The trial court fully and completely explained to the jurors their duties regarding statutory and nonstatutory mitigating circumstances. Defendant failed to object to the reinstruction after it was given. Following the trial court's reinstruction, the jury was able to reach a verdict without further inquiry.

This assignment of error is overruled.

**[46]** In another assignment of error, defendant argues the trial court committed plain error by instructing the jury that it was not to make any factual inferences from his rulings. The trial court gave the jury peremptory instructions on mitigating circumstances. In giving these

instructions, the trial court said that "all the evidence tends to show this is true." Shortly thereafter, the trial court instructed the jury as follows:

> Now, the law, as indeed it should, requires the presiding judge to be impartial. So you're not to draw any inference from any ruling that I've made, or any inflection in my voice or expression on my face, or anything else I may have said or done during this trial. As I say, you're not to let that indicate to you that I have an opinion or have intimated an opinion as to whether any part of the evidence should be believed or disbelieved, as to whether any aggravating or mitigating circumstance has been proved or disproved, or as to what your recommendation ought to be. It is solely up to you to find the true facts of a case and to make a recommendation reflecting the truth as you find it to be.

*See* N.C.P.I.—Crim. 150.10 (1993). Defendant argues this instruction undermined and rendered meaningless the peremptory instructions.

It appears defendant's appellate counsel has twisted the trial proceedings to create the appearance of impropriety. This Court has held that even when a peremptory instruction is given, jurors can reject the evidence if they lack faith in its credibility. *State v. Carter*, 342 N.C. 312, 322, 464 S.E.2d 272, 279 (1995), *cert. denied*, 517 U.S. 1225, 134 L. Ed. 2d 957 (1996). The instruction in the present case permitted the jury to determine whether it believed the evidence presented even when contradictory evidence was presented. The trial court's later instruction was consistent with the peremptory instructions.

This assignment of error is without merit.

## PRESERVATION ISSUES

Defendant raises seven additional issues which he concedes have been previously decided contrary to his position by this Court: (1) the trial court erred by sustaining the State's objection to defendant's argument concerning the method of execution by lethal injection in a manner limiting defendant's mitigating argument; (2) the trial court erred by instructing the jury that it must be unanimous as to issues one, three, and four; (3) the trial court erred by instructing the jury that it could consider all guilt phase evidence during the penalty phase; (4) the trial court's instruction on the especially heinous, atrocious, or cruel aggravating circumstance was unconstitutionally vague; (5) the indictments for murder and kidnapping were insufficient; (6) defendant was subjected to multiple punishments arising

out of the same transaction; and (7) defendant's exposure to the jury in leg shackles and handcuffs violated N.C.G.S. § 15A-1031.

We have considered defendant's contentions on these issues and find no reason to depart from our prior holdings. Therefore, we reject these arguments.

## PROPORTIONALITY REVIEW

[47] Having concluded that defendant's trial and capital sentencing proceeding were free from prejudicial error, we are required to review and determine: (1) whether the evidence supports the jury's finding of the aggravating circumstances upon which the sentence of death was based; (2) whether the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2).

In the present case, the jury convicted defendant of first-degree murder based on malice, premeditation, and deliberation, and under the felony murder rule. The jury also found defendant guilty of second-degree kidnapping. Following a capital sentencing proceeding, the jury found four aggravating circumstances: (1) defendant had been previously convicted of a felony involving use of violence to the person, N.C.G.S. § 15A-2000(e)(3); (2) the murder was committed while the defendant was engaged in the commission of kidnapping, N.C.G.S. § 15A-2000(e)(5); (3) this murder was especially heinous, atrocious or cruel, N.C.G.S. § 15A-2000(e)(9); (4) this murder was part of a course of conduct in which defendant engaged and which included the commission by defendant of other crimes of violence against another person, N.C.G.S. § 15A-2000(e)(11).

Three statutory mitigating circumstances were submitted for the jury's consideration: (1) the murder was committed while defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2); (2) the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired, N.C.G.S. § 15A-2000(f)(6); and (3) the catchall mitigating circumstance that there existed any other circumstance arising from the evidence that any juror deems to have mitigating value, N.C.G.S. § 15A-2000(f)(9). Of these statutory mitigating circumstances, the jury found only (f)(2) to exist. Of the 22 nonstatutory mitigating circumstances submitted by the trial court, the jury found

six to exist: (1) defendant cared for and assisted his mother, Catherine Prevatte, while living with her; (2) defendant helped his mother financially; (3) defendant made repairs to his mother's house; (4) defendant took his mother to the doctor, grocery store, and church; (5) defendant, after his release from the Georgia Department of Corrections, attended Southside Baptist Church; and (6) defendant served on the Southside Baptist Church building grounds committee.

After thoroughly examining the record, transcript, briefs, and oral arguments, we conclude the evidence fully supports the aggravating circumstances found by the jury. Further, we find no indication the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. We turn then to our final statutory duty of proportionality review.

The purpose of proportionality review is to "eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Proportionality review also acts "[a]s a check against the capricious or random imposition of the death penalty." *Barfield*, 298 N.C. at 354, 259 S.E.2d at 544. In conducting proportionality review, we compare the present case with other cases in which this Court concluded the death penalty was disproportionate. *McCollum*, 334 N.C. at 240, 433 S.E.2d at 162.

We have found the death sentence disproportionate in seven cases. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713; *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

We conclude this case is not substantially similar to any case in which this Court has found the death penalty disproportionate. Defendant was convicted on the basis of malice, premeditation, and deliberation, and under the felony murder rule. "The finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *Artis*, 325 N.C. at 341, 384 S.E.2d at 506. Further, this Court has repeatedly noted that "a finding of first-degree murder based on theories of premeditation and deliberation and of felony murder is significant." *State v. Bone*, 354 N.C. 1, 22, 550 S.E.2d 482,

495 (2001), *cert. denied,* —— U.S. ——, 152 L. Ed. 2d 231 (2002). Moreover, defendant kidnapped the victim and her ten-year-old son Matthew at gunpoint in their own home. Defendant locked Matthew in a bathroom, tied up his mother, and then gunned her down as she screamed for help and tried to run away. While the victim was not murdered inside the house, the attack that precipitated the murder took place there and led to the victim's brutal death upon her attempt to escape. It is thus worthwhile to note this Court's oft-cited proviso that "[a] murder in the home 'shocks the conscience, not only because a life was senselessly taken, but because it was taken [at] an especially private place, one [where] a person has a right to feel secure.'" *State v. Adams,* 347 N.C. 48, 77, 490 S.E.2d 220, 236 (1997) (quoting *Brown,* 320 N.C. at 231, 358 S.E.2d at 34) (alterations in original), *cert. denied,* 522 U.S. 1096, 139 L. Ed. 2d 878 (1998). In the present case, defendant viciously killed the victim after confronting and kidnapping the victim's young son. There is no doubt defendant invaded the sanctity of the victim's home. These facts clearly distinguish this case from those in which this Court has held a death sentence disproportionate.

We also compare this case with the cases in which this Court has found the death penalty to be proportionate. *McCollum,* 334 N.C. at 244, 433 S.E.2d at 164. Although we review all cases in the pool of "similar cases" when engaging in our statutorily mandated duty of proportionality review, "we will not undertake to discuss or cite all of those cases each time we carry out that duty." *Id.; accord State v. Gregory,* 348 N.C. 203, 213, 499 S.E.2d 753, 760, *cert. denied,* 525 U.S. 952, 142 L. Ed. 2d 315 (1998). After thoroughly analyzing the present case, we conclude this case is more similar to cases in which we have found the sentence of death proportionate than to those in which we have found it disproportionate.

Whether a sentence of death is "disproportionate in a particular case ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green,* 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied,* 513 U.S. 1046, 130 L. Ed. 2d 547 (1994). Therefore, based upon the characteristics of this defendant and the crimes he committed, we are convinced the sentence of death recommended by the jury and ordered by the trial court in the instant case is not disproportionate or excessive.

Accordingly, we conclude defendant received a fair trial and capital sentencing proceeding, free from prejudicial error. The judgments and sentences entered by the trial court, including the

IN RE BROWN

[356 N.C. 278 (2002)]

sentence of death for first-degree murder, must therefore be left undisturbed.

NO ERROR.